**UNITED STATES of America ex rel. Alexander LITTLE, Petitioner-Appellant,**

v.

**John J. TWOMEY, Warden, Respondent-Appellee.**

No. 71–1743.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1972.

Decided April 19, 1973.

---

James R. Streicker, Chicago, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., Michael J. Murphy, Chicago, Ill., for respondent-appellee.

Before FAIRCHILD, PELL and STEVENS, Circuit Judges.

PELL, Circuit Judge.

Appellant Alexander Little, presently in state custody under two concurrent 20 to 40 year sentences for murder and robbery, appeals from the denial of a writ of habeas corpus. The district court in a preliminary order of November 10, 1970, dismissed all but two of Little's numerous claims,[1] having determined that he had not exhausted his state court remedies as to such dismissed claims by his appeal to the Illinois Supreme Court. People v. Little, 44 Ill. 2d 267, 255 N.E.2d 447 (1970). The two remaining issues were the denial of a right to speedy trial and incompetence of trial counsel. On January 29, 1971, the district court denied the writ.

From the state court transcript there is little doubt that Little did in fact rob

---

1. The range of dismissed claims in the *pro se* petition before the district court swept broadly through alleged mistreatment at the Illinois Security Hospital, faulty indictment, hostility of the trial judge, intellectually and racially discriminatory jury, improper pretrial procedures, improper conduct of the prosecuting attorney, hostile appellate counsel, and a general denial of due process. The foregoing is a most abbreviated summary of the six pages of the single spaced, detailed statement of claimed grounds for the writ. The district court appears to have resisted what might be an expectable human impulse, arising from the indiscriminately wide claim of improprieties of the judicial procedures afforded the claimant, to have dismissed the entire petition as frivolous.

a tavern on the evening of July 10–11, 1962. In leaving the scene, he shot and killed a man. The principal, if not the only, defense presented at trial was that he was legally insane. Little testified at his trial that he could not remember anything from a couple of days before the robbery until two months after the event.

Little had been apprehended shortly after the robbery and shooting. While in jail he twice attempted suicide and was totally uncommunicative. The public defender moved for a psychiatric examination. Dr. Haines, Director of the Behaviour Clinic of the Criminal Court of Cook County, examined Little and recommended that he be committed as "insane," since he was unable to understand the charges against him or co-operate with an attorney. Following a sanity hearing before a jury on August 3, 1962, Little was committed to the Illinois Security Hospital. It would appear that Dr. Haines had a question as to whether Little might have been malingering.

On February 5, 1964, Little filed a petition for a writ of habeas corpus in the Circuit Court of Randolph County requesting a sanity hearing. At the hearing, Little was unrepresented by counsel, and apparently his counsel of record, the public defender, was never advised of these proceedings although the statute requires it. Ill.Rev.Stat. 1963, ch. 38, § 104–3. He testified that he knew the nature of the charge against him and that he would cooperate with his attorney in preparing his defense. A Dr. E. R. May testified that Little was very uncooperative and abusive, that he had refused work, and that May felt that "he is not ready for a discharge at this time." The court denied Little's petition at the end of the hearing.

We are left with the impression from Little's brief on this appeal that the attention given to his claim of competency was cursory and nonmeaningful. While the hearing of April 1964 may not have been marked with a full panoply of due process trappings, our own independent examination of the record convinces us that he was scarcely a forgotten man as far as the State of Illinois was concerned. The testimony of Dr. Haines reflects a continuing course of seeing and examining Little to determine whether he knew "the nature of the charge and was he able to cooperate with his counsel." Dr. Haines's examinations of Little according to his testimony occurred on August 1 and 12 and September 9 in 1962, January 12 and October 19 in 1963, March 15 and April 9 in 1964, and January 24, May 23 and August 18 in 1965. According to the doctor, "when I would examine him he never told me the nature of the charge or cooperated in the examination." This status remained true even as late as May 1965 when Little told the doctor that he had filed the petition in Cook County. By the time that this petition came on for hearing in August of 1965, Little for the first time, at the examination of August 18, 1965, had discussed with the doctor the charges in such a manner that the doctor could give the opinion that Little was competent to stand trial.

During much of the intervening time, Dr. Haines apparently entertained a suspicion that Little was malingering; however, to force the defendant into a trial upon this suspicion while the manifestations of the malingering, if that was the fact, continued to exist would leave the situation open to the charge that he indeed was not competent to stand trial. Certainly if Little was malingering, the pointing finger of responsibility for delay returns to him, and if he was not, there was a reasonable basis for not taking him to trial.

Little's brief on this appeal does not indicate that the Randolph County Circuit Court relied on testimony other than that of Dr. May; however, it appears that Dr. Haines was present at the hearing and either testified or explained to the court what his opinion was. In fact, Little in the state court in a motion to dismiss filed in 1966 referred to the

fact that Dr. May testified with Dr. Haines concurring.

We have no reason from this record for thinking other than that the State of Illinois was desirous of getting on with the trial, but as Judge Marovitz stated, "the delay resulted from an attempt to protect petitioner until he was capable of standing trial."

■ ■ Subsequently, Little filed another petition for a competency hearing in the Circuit Court of Cook County. A hearing was held on August 25, 1965, and a jury found Little competent to stand trial. Little's trial and conviction followed several months thereafter. In the Illinois Supreme Court, Little relied primarily on the violation of the Illinois statute which requires the state to bring a defendant to trial within 120 days. (Ill.Rev.Stat.1961, ch. 38, § 748, now Ill.Rev.Stat.1971, ch. 38, § 103–5.) Federal habeas corpus, however, only reaches violations "of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, we must decide only whether or not Little's federal constitutional right to a speedy trial was violated.

■ ■ The Sixth Amendment right to a speedy trial is as fundamental as other aspects of that Amendment which have been applied to the states through the Fourteenth Amendment. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court mandated a balancing test to determine if the right to a speedy trial had been violated. Four factors are to be considered in each case: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530, 92 S.Ct. at 2192. Here, the length of delay is such as to be presumptively prejudicial: Little was not brought to trial until 4 years after the crime took place.

■ But the state contends that the reason for the delay—Little's incompetency to stand trial—compels a conclu-sion that the right to a speedy trial was not denied. Certainly a defendant who is incompetent, in that he does not understand the crime with which he is charged and cannot help his counsel, cannot be tried. Such action would constitute a denial of due process. People v. McLain, 37 Ill.2d 173, 226 N.E.2d 21 (1967). The incarceration for a reasonable period of time because of established incompetency to stand trial would thus appear to be a sufficient answer to any speedy trial claim under the Sixth Amendment as applied to states under the Fourteenth Amendment. A different matter, and one not argued here, would be involved if Little had been held "more than the reasonable period of time necessary to determine whether" there was a substantial probability that he would attain capacity in the foreseeable future. Cf. Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In our opinion, in either context, "a reasonable period of time" must to some extent be equated with the gravity of the offense involved. Here the charge was murder and robbery as contrasted to a petty theft. Little was in a state mental hospital, presumably receiving the mental-medical attention provided by such institutions, and during the course of his stay he was examined with a degree of regularity to ascertain whether competency to stand trial had been restored. We may fairly infer from the record that at no time was it indicated that the competency would not be achieved in the foreseeable future.

The factual situation at this point presents an implicit dilemma. If Little had been found competent to stand trial in April 1964, and had been tried, it is not entirely unreasonable to believe that notwithstanding he had claimed then he was competent and would cooperate with counsel, we would now be met with a claim that he was improperly forced to trial over the opinion of the examining doctor that he was not ready for a discharge.

Little, however, argues that he should have been declared competent after the

initial hearing in the Randolph County Circuit Court. Not only does he contend that the factual determination of the judge was wrong, but he also argues that the denial of his procedural rights was so substantial as to require a presumption that the limitation period of the speedy trial test must be presumed to have commenced running on that date.

Both the Illinois Supreme Court, 44 Ill.2d at 271, 255 N.E.2d 447, and the district court refer to the fact that Little did not appeal the adverse decision. We find no aspect of waiver in this failure and do not read the previous decisions to this effect. Little's counsel of record was not informed of the hearing. Little, who apparently was not advised of his right to appeal, was incarcerated in a mental institution. We do note, however, if there had been an appeal the only relief which could have been ordered was to remand for another hearing. That was secured by Little the following year, in all probability prior to the time that an ordered hearing following an appeal reversal would have been held.

Even though the 1964 hearing itself lacked some of the adversarial indicia of due process, we do note that the trial judge had an opportunity to observe Little's appearance and demeanor. Especially when the question is one of the competency of an individual to stand trial, the cold transcript may not reflect one of the most important pieces of evidence available to the trier of fact—the individual's demeanor. Thus, we are unable to say that the court would have come to a different conclusion if there had been a searching cross-examination of the doctors.

Even if the state should have brought Little to trial after the April 9, 1964 hearing, the delay until he was determined to be competent to stand trial amounted to approximately 16 months. Subsequent delay was attributable to Little's demands for different counsel and withdrawal of counsel, as well as one mistrial declared on the defendant's

motion due to prejudicial newspaper statements. The 16 months' delay is less than that in Barker v. Wingo, *supra*, which the Court ultimately found not to be a violation of the right to a speedy trial.

The third *Barker* factor is demand for trial. Here Little's filing of his *pro se* petition for a writ of habeas corpus in Randolph County would seem to serve as a demand which was repeated in two subsequent petitions. This is in contrast to *Barker*, where the Court found that Barker did not want a speedy trial, 407 U.S. at 534, 92 S.Ct. 2182. Little apparently wanted to be tried, at least from the date he filed his habeas corpus petition.

The final factor to be considered on trial delay is whether there was prejudice to the defendant. There is always the possibility of prejudice to a defendant from any delay of a trial, although this is a two-edged factor, as the memory and ability of state witnesses to testify accurately are subject to the same time hazards as defense witnesses'. Other factors of delay-prejudice are outlined in *Barker, supra*, 407 U.S. at 532–533, 92 S.Ct. 2182. We are particularly concerned here, however, not so much with the inherent possibility of prejudice in the general sense as with whether there was specific prejudice to Little in his defense. United States v. De-Tienne, 468 F.2d 151, 157 (7th Cir. 1972).

In this respect, Little relies on two factors, the difficulty of proving his insanity defense where his psychiatrist did not examine him until three and one-half years after the offense and a missing witness. As to the first of these, it appears to us, as will be hereinafter discussed, that the crucial aspect was not so much the delay in the psychiatric examination as its inconclusiveness.

The second matter, the missing witness, as far as we can see, is being presented to any reviewing body for the first time on this appeal. The statement appears in Little's brief that a

witness, "Miss Kathrine Warthon, was dating petitioner at the time of the offense and had been for some time. Her testimony would have been extremely helpful in terms of establishing petitioner's pattern of behavior and mental state at or near the time of the offense. However, when petitioner finally came to trial, Miss Warthon had left the jurisdiction of the court. As a result, an important link in establishing the defense of insanity was lost."

No source, in the record or elsewhere, is stated in the brief. There is no indication when the previously unidentified witness may have departed or how long she may have been unavailable. As far as we can tell from the reference in the brief, she might have been unavailable if there had been a much earlier trial date. There is no showing that there were not other intimates who could have testified to his pattern of behavior such as fellow employees, other social acquaintances, members of his family, and neighbors. This was not a case of a sole alibi witness but of a witness who was to testify as to facts which, if true, should have been discernible to others with whom Little had frequent contact. Also, there is nothing to indicate that Miss Warthon's actual whereabouts were unknown. If she had left the jurisdiction she would not have been subject to subpoena presumably, but there is no showing that she would not have come back voluntarily or that her deposition could not have been taken.

Finally, our independent examination of the record causes the air of mystery to deepen. During the course of the trial, Little's counsel indicated he had two more witnesses who were not in court. One of these was Little's brother, of whom more hereinafter. The other witness was Thelma Lewis whose address was given. The brother was to get her. This witness had been, according to the defendant, in his company a week or two prior to July 10th, the date of the offense. She was described as a social acquaintance.

The trial court with a show of consideration to Little had the state go ahead with rebuttal witnesses but held the case open so that the absent witnesses could testify the next day if they appeared. On the next morning, Thelma Lewis was not present but counsel stated "if she does arrive I'm not going to put her on the stand, I think it is in the best interest of my client." We find no reference to Miss Warthon.

Little's brother did, however, appear and testify as to the matter of the defendant's behavior during the period prior to the date of the offense. The court, in our opinion, evinced a desire to see that the defense was not thwarted by overly technical evidentiary rules. Thus, the transcript reflects the following:

Q. Now, in the spring of 1962, did you notice anything unusual about your brother's behavior or any change?

MR. OPLATKA: Object to that date, the date in question is July of 1962.

THE COURT: Well, I'll allow him to answer.

MR. CAWLEY: Q. Do you remember the question?

A. Repeat it again.

MR. CAWLEY: Q. In the spring of 1962, in the months of May or June or at anytime did you notice anything unusual about your brother's behavior?

A. Yes, he made quite a change, yes.

Q. When you say a change are you referring to something different than his previous actions?

MR. OPLATKA: Objection, your Honor, that is leading.

THE COURT: He may answer.

A. Yes, his attitude was different, he drinked a lot more and he was more—used more vulgar words around my wife and children.

The brother further testified that on one occasion when he had denied Little

the use of the brother's automobile because the brother's wife wanted to use it, Little had used vile language in front of the wife. It was still cold when this happened and otherwise the date of the incident was not definite. Also, in June 1962, Little "used a lot of language" around his mother, and the brother told Little he should respect his mother. The witness did not recall any other specific instances of conduct. Nevertheless, although a lay witness, the court did permit him over objection to express an opinion:

Q. Do you have an opinion based upon your observance of the change in your brother, as to his mental condition in July of 1962?

MR. OPLATKA: Objection.

THE COURT: I'll allow him to answer.

A. I would say he was mentally instable because of the attitude he take.

MR. CAWLEY: Would you repeat that, please?

A. He was mentally disturbed because of the attitude he taked toward his people and his friends.

Q. Was that condition substantially different than his condition in prior years?

A. Yes.

MR. CAWLEY: That is all.

We note the brother's testimony in part because of its indication that the state trial court appeared not to have been affording less than a full opportunity to Little to prove his defense and in part as it reflects upon Little's claim, hereinafter treated, that his counsel did not competently present that defense. At most, the testimony of Miss Warthon, and it is far from clear just what her testimony would have been, would probably have been cumulative to that which the brother adduced.

We turn then to balancing the four factors discussed above on an *ad hoc* basis. There was a delay of 16 months based on a claim of a denial of Little's right to due process in a competency hearing. Little did request a trial. Prejudice to him seems scarcely clearly demonstrated other than in a general sense. On these facts, it is our opinion that the delay was not such as to deprive Little of his right to a speedy trial. We place weight on the fact that the state's reasons were not shown to be wrong and the prejudice both by the lack of adversarial proceedings and to his defense would seem to be *de minimis*.

Little also claims that his appointed trial counsel was incompetent since he was unable to phrase an unobjectionable question to the defense's psychiatric expert witness, Dr. Seglin. This court has stated that a trial must be a "sham or mockery" in order for a petitioner to be entitled to "habeas corpus relief by reason of ineffective assistance of counsel," Sims v. Lane, 411 F.2d 661, 665 (7th Cir. 1969), cert. denied, 396 U.S. 943, 90 S.Ct. 378, 24 L.Ed.2d 244. The United States Court of Appeals for the District of Columbia recently stated that the "sham or mockery" standard is based on the Fifth and Fourteenth Amendments' due process clauses. That court stated in Scott v. United States, 138 U.S. App.D.C. 339, 427 F.2d 609 (1970), that the Sixth Amendment right to counsel compels a higher standard of competence of counsel, to-wit: "whether gross incompetence blotted out the essence of a substantial defense." 427 F.2d at 610. It is this latter test that Little urges us to apply to his case. Little's only defense was insanity. Thus, it might be argued that in his case the two tests are virtually indistinguishable since if his attorney was so incompetent as to "blot out the essence" of his only "substantial defense" the trial might be reduced to a "sham or mockery."

The district court agreed with the Illinois Supreme Court that Little was ably represented, that all favorable evidence was presented on his behalf, and that the trial court's rulings during Dr. Seglin's testimony were basically due to the court's beliefs about the doctor's qualifications to testify about a certain

matter. We might not agree if these courts were in effect saying that Dr. Seglin's examination, conducted in December 1965, was too remote to permit him to be considered a competent witness. Wright v. United States, 102 U.S. App.D.C. 36, 250 F.2d 4, 9 fn. 2 (1957). As an expert witness, the doctor should have been capable of determining whether he could form an opinion as to the mental capacity as of a time three and one-half years prior to the date of the examination. If he had expressed an opinion as of the earlier date, the remoteness of the examination would go to the weight rather than the competency of the testimony.

◼ Here, however, under the above standard, the doctor, who apparently was well qualified in his specialty, did, from a fair reading of the record, indicate that he had not formed an opinion sufficiently medically certain to permit the expression thereof. The examination conducted at the county jail lasted approximately one and a half hours. The examination consisted of reviewing hospital records and interviewing the patient. It is not clear whether the expressed time included both the record review and the interview, but even if it did not, the total exposure of the doctor to the individual was only a very short time. When Dr. Seglin was asked about his opinion he stated it in terms of being "quite possible." This, of course, is sufficiently indefinite that we could not say the trial court, which had been somewhat lenient in letting in arguably improper testimony on the issue, abused its discretion. Further, Dr. Seglin admitted on cross-examination that he had no idea of Little's mental condition as of the date of the offense. Since the doctor, although only having a limited period for examination of Little, did have an opportunity to examine his hospital records, it appears to us to be a fair inference that the lapse of time before the examination was not the precluding factor in his lack of opinion but rather that there was insufficient indication of factors in Little's history to enable a psychiatrist to

form an opinion with any degree of medical certainty.

We are not considering the court's rulings as we would in the case of a direct appeal but are only considering them in the context of a constitutional claim of incompetent counsel. The plain fact as it appears to us is that the counsel did what he could with the material he had, but that that material just did not include an opinion as to mental competency on the crucial date.

Little also argues, however, that irrespective of the doctor having an admissible opinion based upon the actual case, the defense could have been helped by an answer to a hypothetical question and that his counsel was unsuccessful in phrasing such a question. A hypothetical question, of course, could only have encompassed predicate facts which had been introduced into evidence, and while we agree that the attorney was unsuccessful in phrasing an unobjectionable question, we cannot say on the meagre material, such as the use of vile language in front of his brother's wife, which he had as a basis for use in a hypothetical question, that his lack of success blotted out the essence of a substantial defense, much less that it made the trial a sham or mockery. We do not say that the art of advocacy reached its highest level in the particular situation but merely that on the total picture the representation was not so deficient as to bring into play the constitutional violation of right of effective counsel.

Finally, we must consider Little's claim that the district court was incorrect in dismissing some of his claims for failure to exhaust state remedies. In his direct appeal, Little's counsel only raised the competence of trial counsel and the speedy trial issues. The relationship between Little and his appellate counsel was marked by friction over the speed or lack of same with which counsel was pursuing the appeal. In his petition in the district court, Little alleges as one of his grounds for the issuance of a writ of habeas corpus the

indifference and hostility of appellate counsel.

On these facts, we think that this case resembles most closely People v. Hamby, 32 Ill.2d 291, 205 N.E.2d 456 (1965), where the Illinois Supreme Court relaxed its usual rule that the failure to raise an issue on direct appeal bars its subsequent assertion in a Post-Conviction Hearing Act proceeding. Hamby had unsuccessfully tried to have his appellate counsel changed and to have the court consider other points not raised by counsel. The court had denied all such motions and affirmed the conviction. When Hamby sought to raise these same matters, not raised by his counsel on appeal, in a Post-Conviction Hearing, on motion of the state, the petition was dismissed on the basis of the *res judicata* effect of the Supreme Court's decision. Hamby appealed and the Illinois Supreme Court reversed, carving out a narrow exception to the waiver doctrine "where fundamental fairness so requires." 32 Ill.2d at 294, 205 N.E.2d 456. It appears to us that Little's alleged relationship with his appellate counsel is closer to Hamby's than to the situation in People v. Ashley, 34 Ill.2d 402, 216 N.E.2d 126 (1966), or People v. Agnello, 35 Ill.2d 611, 221 N.E.2d 658 (1966), where the doctrine was not relaxed. As this court said in a similar case, "We cannot assume that petitioner's disagreement with counsel cannot ultimately be presented to the Illinois Supreme Court for consideration in aid of petitioner's review should he not prevail in the post-conviction remedy, which the state concedes is available to him." United States ex rel. Millner v. Pate, 425 F.2d 249, 250 (7th Cir. 1970). As in *Millner*, we assume that the State of Illinois will not object on the ground of waiver to such a petition which it has in this court conceded to be procedurally proper.

For the reasons hereinbefore given, the judgment of the district court is affirmed.

Affirmed.

FAIRCHILD, Circuit Judge (concurring).

Defense counsel called as a witness the psychiatrist who had examined Little in December, 1965. The direct testimony, after qualifying the witness, went as follows:

"Q. How long did that examination take? A. The examination took approximately one and a half hours.

Q. And of what did this examination consist. A. The examination consisted of reviewing hospital records and interviewing the patient in direct question and answer type of interview."

\*     \*     \*     \*     \*     \*

"Q. Did you have sufficient material at that time, Doctor, to form an opinion as to the legal sanity of Mr. Little?

[Prosecutor]: Objection, your Honor.

THE COURT: At that time.

[Defense counsel]: Up until today.

THE COURT: Only as of December, 1965, when he examined him.

[Defense counsel]: This was a preliminary question. Did you have enough material and was your examination sufficient to allow you to form an opinion? A. At the time of my examination?

Q. Yes. A. Yes.

Q. And based upon your experience, Doctor, and your examination of Mr. Little and the hospital records, and from the knowledge which you know concerning this crime itself, the commission of this crime as charged, murder and robbery, do you have an opinion as of this date, as of today, as to the legal sanity—I would like to read that more carefully, to define it—whether or not a person, due to mental disease or mental defect, lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; do you have an opinion as to whether or not Alexander Little

776

was legally sane on July 10, 1962? A. I do have an opinion, yes.

Q. Will you state that opinion for the Court? A. My opinion is that it is quite possible, from a psychiatric point of view, that he was not competent to make the judgments necessary to conduct himself in accordance with the law on that date.

[Prosecutor]: Object to that answer, that is not—

THE COURT: Sustained, it is stricken.

You will have to give him a hypothetical question with all the things that are here. How can he say what a man was back in—can you say definitely what a man's condition was back in 1962 when you examined him in 1965? A. No, I could not.

[Defense counsel]: Q. But based upon certain materials and your own examination—

THE COURT: Sustained.

[Prosecutor]: Object.

THE COURT: Sustained.

[Defense counsel]: Well—

THE COURT: Counsel, the only way he can give an opinion, you will have to lay the proper foundation, you will have to ask a hypothetical question with all the facts and circumstances, based on that.

[Defense counsel]: I'll ask a hypothetical. Would the Court permit me, in the hypothetical question, permit me to include the background upon which he made this examination?

THE COURT: The only hypothetical questions are hypothetical things— or the matters that are presented here, that are before this jury.

[Defense counsel]: Well, the doctor based his opinion upon certain examinations performed.

THE COURT: He didn't perform these examinations.

[Defense counsel]: He performed one examination.

THE COURT: In December of 1965. You can find out what his opinion

was of the man in 1965 when he examined him, what his opinion was as to his mental condition then.

[Defense counsel]: Well, that is half the problem. I'll phrase the hypothetical, Judge.

Do you have an opinion, Doctor, based upon your examination of December 1, 1965, as to Mr. Little's mental capacity and condition as of that time?

[Prosecutor]: Objection, your Honor, that is not the statutory definition.

THE COURT: Sustained.

[Defense counsel]: Q. Do you have an opinion as to Alexander Little's legal sanity as of that date?

[Prosecutor]: Object.

THE COURT: Sustained.

[Defense counsel]: Q. Do you have an opinion as to whether or not the defendant had sufficient capacity to conduct his conduct to the requirements of law and that he had sufficient capacity to appreciate the criminality of his conduct?

[Prosecutor]: Objection, no foundation laid.

THE COURT: Sustained.

[Defense counsel]: I have no further questions. Any cross?

THE COURT: And the part that the doctor said on possibility, that is stricken and the jury is instructed to disregard it."

With all respect, I must conclude that defense counsel was wholly unprepared to make any meaningful use of this expert. This was the only defense he was trying to present. There was no surprise or other excuse for failing to ascertain in advance what relevant opinions the expert was able to form and for failing to ask appropriate questions if such opinions warranted bringing this expert before the jury. It is most unlikely that it was trial strategy just to get the doctor before the jury and to ask improper questions in order to avoid unfavorable answers. The prosecutor, in final argument, made good use of the fact that the

judge struck out the answers the doctor "tried to give here to help this man."

Undoubtedly defense counsel failed to prepare himself by conferring with the doctor and learning what appropriately based and relevant opinions the doctor could state. It may well be he would have learned there was no purpose in calling him. If the doctor were able to state relevant opinions, upon an appropriate hypothesis, counsel was unprepared to adduce them.

At the time the doctor testified, the jury had heard Little's own testimony concerning his loss of memory, and that fact was available for a hypothesis. Counsel had not, however, brought before the jury other clearly available information which would seem likely to make a difference if any would, *e.g.*, two suicide attempts and bizarre behavior during the three weeks following the murder and robbery, a jury's finding on August 3, 1962 that Little was then insane, and hospital records during the period of his hospitalization.

Defense counsel's performance in this area appears dismal. Nevertheless the record contains much to demonstrate that the insanity defense lacked substance.

Much of the material about Little's bizarre behavior in jail and his hospitalization was later brought before the jury by Dr. Haines, a state rebuttal witness, who observed Little at the jail and thereafter. Dr. Haines thought that Little was malingering, although at the first observations he was unable to say whether Little's conduct was malingering or a psychological reaction to his impending trial. The testimony of persons who observed and spoke with Little for a period of hours after the offense was convincing that he behaved normally, and correctly gave information concerning his identity, employment history, and family. In the entire examination of the defense psychiatrist, by both counsel and the court, there is a strong suggestion that his opinion would never have risen above the level of mere possibility, even if appropriate questions had been asked.

Although aware that the harmless error doctrine can not be applied to denial of right to counsel. Chapman v. California, 386 U.S. 18, 23, footnote 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), I can agree here that there was no substantial insanity defense to be "blotted out" and that the trial was not reduced to a sham or mockery.