Charles **THOMAS** ,Plaintiff-Appellant,

v.

**Warden Frank J. PATE et al.,**
**Defendants-Appellees.**

**Luther W. MILLER, Plaintiff-Appellant,**

v.

**ILLINOIS DEPT. OF CORRECTION, IL-**
**LINOIS STATE PENITENTIARY, War-**
**den Frank J. Pate, Defendants-Appel-**
**lees.**

**Nos. 71–1410, 71–1411.**

United States Court of Appeals,
Seventh Circuit.

Jan. 10, 1974.

Rehearings Denied April 4, 1974.

Lynne E. McNown, Jerold S. Solovy, Chicago, Ill., for plaintiffs-appellants.

William J. Scott, Atty. Gen., Thomas E. Holum, James B. Zagel, Melbourne A. Noel, Jr., Asst. Attys. Gen., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Circuit Judge, KILKENNY, Senior Circuit Judge,[*] and STEVENS, Circuit Judge.

FAIRCHILD, Circuit Judge.

Plaintiffs Thomas and Miller are black inmates incarcerated in the Illinois State Penitentiary at Joliet, Illinois. They appeal from a judgment entered in favor of defendant prison officials in three consolidated actions. These suits were brought under 42 U.S.C. § 1983 seeking injunctive and monetary relief for alleged violations of plaintiffs' civil rights. Plaintiffs assert that prisoners are housed in racially segregated cells; that because of their race, black prisoners are afforded less desirable job and educational opportunities than other prisoners; that conditions in the disciplinary cells constitute cruel and unusual punishment; that plaintiff Thomas was denied procedural due process in intra-prison disciplinary proceedings; that plaintiff Thomas was punished for his refusal to admit guilt; that plaintiff Thomas was denied proper medical care; that plaintiff Thomas was denied reasonable access to the courts; and that defendants violated the equal protection clause by their method of distributing underwear to prisoners.

On appeal, plaintiffs argue that they were denied a fair hearing by the district court's refusal to permit them to address the court directly despite plain-

---

[*] Senior Circuit Judge John F. Killenny, of the Ninth Circuit, is sitting by designation.

tiffs' express dissatisfaction with court-appointed counsel;[1] that the district court erred in finding there is no racial discrimination at the prison; and that the district court should not have dismissed various portions of the Thomas complaint for failure to state a claim upon which relief can be granted.

It appears from the complaints that plaintiffs attempted to bring these actions on behalf of a class consisting of all black inmates incarcerated in the prison. The district judge found that plaintiffs are not representative of any group of prisoners confined in the prison. We do not review the appropriateness of this finding because plaintiffs have not raised this issue on appeal.

### 1. *Racial Discrimination in Composition of Cells.*

The racial composition of the prison at the time of trial was 60.2% black and 39.8% Caucasian and other minorities. The general population is housed in one-man, three-men, six-men, and twelve-men cells; prisoners confined in punitive status are housed in twelve-men cells.

Each cell-block houses a racially mixed population of prisoners. However, the uncontradicted testimony of plaintiffs reveals that it is and has been in the past extremely unusual for a black prisoner to share a cell with a Caucasian or a prisoner of another race. Cellhouse charts maintained by prison officials record the racial composition of each cell but were not introduced at trial.

Unfortunately the paucity of evidence in the present record with regard to prison policies governing cell assignments for incoming prisoners and prisoners' cell transfer requests precludes us from determining whether the existing condition of segregation is attributable to the state, so that violation of the equal protection clause of the fourteenth amendment is demonstrable. See generally Comment, School Desegregation After Swann: A Theory of Government Responsibility, 39 U.Chi.L.Rev. 421 (1972).

The evidence is insufficient to determine without speculation whether cell assignments of new inmates prior to 1966 were made without regard to race or were designed to preserve racially homogenous cells. Mr. Shea, a prison official, testified that the first attempt affirmatively to create racially balanced cells by considering race in assigning new inmates occurred about 1966. The only other relevant evidence is defendants' ambiguous admission in the amended and reinstated answer that at "various times in the past," incoming inmates have been assigned cellmates by "considering racial characteristics among others."

It is also not clear whether prior to 1966 the prison honored a request of an inmate to transfer from a cell in which all the occupants were members of his race to a cell housing inmates of other races. Testimony of Mr. Shea on transfer policies relates to time periods subsequent to 1966. Plaintiff Thomas submitted a verified document containing a conclusory allegation that requests to transfer are routinely denied.

■ Mr. Shea's uncontradicted testimony indicates that between 1966 and 1968, prison officials considered race in assigning cells to incoming inmates in order to obtain racially balanced cells.[2] No statistics have been introduced to indicate the extent of this effort or the proportion of inmates presently incarcerated who were affected by this policy change.

During this period, prison officials attempted to discourage prisoners from transferring in order to avoid living in racially integrated cells. There is, however, no evidence indicating the number of prisoners who insisted upon transfer-

---

1. New counsel appear on this appeal.

2. Genuine indifference to race is the ideal, but consideration of race for the real purpose of correcting past discrimination is not in itself unconstitutional.

ring to racially segregated cells. It does not appear that defendants adopted a program of reassigning prisoners placed in segregated cells prior to 1966, and continuing therein.

The record is uninformative about prison practices with respect to assignment and transfer subsequent to 1968. Mr. Shea indicated that because of an incident within the prison at the time that Dr. Martin Luther King died, the authorities became more reluctant to interfere with prisoners' choices of cellmates. There is no testimony as to whether the policy at the time of trial was to ignore race in assigning incoming inmates to cells or whether race was considered either with the objective of maintaining racially segregated or racially balanced cells. Transfer policies are not clearly revealed.

In Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), the Supreme Court affirmed the order of a three judge district court declaring that Alabama statutes requiring racial segregation in prisons are unconstitutional and establishing a schedule for desegregation. In Cruz v. Beto, 405 U. S. 319, 321, 92 S.Ct. 1079, 1081, 31 L. Ed.2d 263 (1972), the Court cited Lee for the principle that "racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for 'the necessities of prison security and discipline.'" See also, United States v. Wyandotte County, Kansas, 480 F.2d 969 (10th Cir. 1973).

Assuming (although we have noted that it is not clear) that recent policy has not tended to produce racial segregation, there would remain a question of the extent of the duty of defendants to remedy segregation which is a residue of pre-1966 policy, if unlawful.

In instances involving past de jure segregation in schools, the authorities have an affirmative obligation to dismantle the former system. See Swann v. Bd. of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970), reh. denied 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689; Green v. New Kent County School

Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L. Ed.2d 716 (1968); Keyes v. School Dist. No. 1, Denver, Colorado, 413 U.S. 189, 220–223, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Powell, J., concurring).

■ It is our opinion that a similar affirmative duty applies with respect to a past practice of racial segregation in a prison. Although there may be relevant differences between the prison and school situations in terms of risk of racial conflict, potential for violence, and compelled proximity between individuals, and between the rehabilitative and educational purposes served, the principle that intentional segregation is unlawful yields only to "the necessities of prison security and discipline." Lee and Cruz, supra. We think the corollary that there is an affirmative duty to remedy past unlawful practice would yield only to similarly compelling interests.

It can not be determined from the record in this case whether some of the prisoners, for example those remaining in cells assigned prior to 1966, were there as the result of policies pursued under color of law, or, in other words, of de jure segregation similar to that declared unconstitutional in Lee v. Washington, supra.

Assuming the affirmative, defendants must show that they satisfied the affirmative duty to remedy the past practice. In practical terms, they may find it necessary to establish that they have effectuated some degree of actual integration in the prison; for any showing other than the objective fact of actual integration at the present is unlikely to persuade either the members of the prison community or the courts that prison officials have abandoned unconstitutional prior practices of compulsory racial segregation. See Hobson v. Hansen, 269 F.Supp. 401, 494–495 (D.C.1967), appeal dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85. But see Boyd v. Pointe Coupee Parish School Bd., 332 F.Supp. 994 (E.D.La.1971). Once again the paucity of evidence in the record precludes us from resolving these issues.

The record establishes that at the time of the commencement of this action, there was virtually complete separation of inmates according to race in cells of the prison. As we have noted, it has not been demonstrated whether the existing condition of racial separation is the result of intentional segregative policies of prison authorities or whether it stems from the interaction of otherwise permissible, racially neutral policies with social conditions for which prison authorities are not responsible. Under these circumstances, the question is whether plaintiffs have established a *prima facie* case shifting the burden of proof to defendants.

The district court, in finding adversely to plaintiffs, apparently concluded that plaintiffs' burden extended beyond establishing an existing condition of racial separation.

We recognize that in *Keyes, supra,* the Supreme Court indicated that plaintiffs must establish more than an existing condition of racial separation in a school system before the burden is shifted to school authorities to produce evidence that the condition is not chargeable to the state. In addition, some showing must be made of a pattern of past or present intentional segregation. *Keyes, supra,* 413 U.S. at 209–210, 93 S.Ct. 2686.

We are not bound to apply the allocation of proof developed in *Keyes* in prison segregation cases. The Supreme Court in *Keyes* emphasized that "[t]here are no hard and fast standards governing the allocation of the burden of proof in every situation" and that instead allocation of proof questions should be resolved as a matter of " 'policy and fairness based on experience in different situations.' IX Wigmore, Evidence § 2486 (3d ed. 1940)." Its conclusions with respect to allocation of proof are limited explicitly to "the context of racial segregation in public education." *Keyes, supra,* at 209, 92 S.Ct. at 2698.

In the prison context, as contrasted with the public schools, we think there is a higher probability that a pervasive pattern of racial separation in cell occupancy is attributable to intentionally segregative actions for which prison officials are constitutionally accountable. Moreover, it is more difficult for prisoners to obtain and present evidence relevant to segregative intent of prison authorities than for persons challenging segregation in the public schools.

For these reasons we conclude that the burden shifts to the defendant prison authorities once the plaintiffs have demonstrated an existing condition of racial separation in prison cells and that the district court erred in finding adversely to plaintiffs on the basis of their failure to prove the ultimate fact.

2. *Racial Discrimination in Work Assignments.*

The district court found that plaintiffs failed to demonstrate that prison officials discriminate against black inmates in making work assignments. We conclude that this finding is not clearly erroneous.

Plaintiffs contend that menial porter and cleaning jobs are performed by black inmates while white inmates are assigned more desirable clerical positions. Mr. Shea testified, however, that job assignments are made by considering an inmate's educational level, his ability and skills, his other job experiences in the prison, his prison "seniority" (the length of time spent in prison), and his disciplinary record. He further testified that race is considered only in attempting to maintain a racial balance in all jobs.[3] The only statistics introduced as to racial distribution of jobs do not indicate a pattern of racial discrimination. We note that plaintiff Thomas testified that he is satisfied with his job in the furniture shop. Plaintiff Miller complains about his inability to attend "TV College;" however, he was informed that his requests were denied be-

3. Cf. fn. 2, *supra.*

cause of his lack of seniority and his disciplinary record, and he is not certain himself whether the denial was based upon his race.

### 3. *Plaintiffs' Opportunity to be Heard.*

█ Plaintiffs urge that they were denied a fair opportunity to be heard by the district court's refusal to permit them to speak for themselves after they had informed the court about their dissatisfaction with appointed counsel. Specifically plaintiffs claim that it was error not to permit plaintiff Thomas to "assist" his attorney by cross-examining one of the defense witnesses and by summarizing applicable law. Plaintiffs also bring to our attention the district judge's denial of Miller's request to file an amended petition and of Thomas' request to supplement his testimony. These latter rulings do not appear to have involved error or abuse of discretion. In any event, the rulings were not affected by the relationship between plaintiffs and their attorneys.

█ A plaintiff in a civil action, as contrasted with a defendant in a criminal prosecution, has no sixth amendment constitutional right to competent counsel. Nonetheless, plaintiffs in a civil proceeding, whether appearing *pro se* or represented by counsel, must be afforded a fair opportunity to present their case. We conclude that plaintiffs have been afforded such an opportunity here. Our review of the record indicates, that plaintiffs' counsel were not incompetent, when tested by the standard of competency required of attorneys in criminal actions;[4] that the district judge clearly

informed plaintiffs that they must rely upon their counsel, when so represented, to present their case; that plaintiffs never requested that their court-appointed counsel be dismissed; and that in fact the district judge provided plaintiffs with considerable leeway in addressing the court directly.[5]

### 4. *The Failure of the Thomas Complaint to State Claims.*

The district court dismissed several portions of plaintiff Thomas' *pro se* complaint, prior to the appointment of counsel for Thomas, on the ground that the allegations failed to state claims upon which relief can be granted. The question is whether, accepting any factual allegations as true, "it appears 'beyond doubt that plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief' " (citation omitted). Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L. Ed.2d 652 (1972). We proceed to consider each of these portions.

### (a) *Medical Treatment.*

On appeal Thomas asserts that the court erred in dismissing his allegations concerning medical treatment. We note that the district court did not dismiss his allegation that black inmates receive lower quality medical treatment than white inmates. No evidence, however, was introduced on this issue at trial.

█ It is well established as a general principle that prison officials are vested with broad discretion in determining the nature and character of medical treatment afforded to state prisoners. Henderson v. Pate, 409 F.2d 507,

---

4. In a criminal proceeding the question is whether the incompetence of counsel turned the trial into a "sham or mockery" or at least "blotted out the essence of a substantial defense." United States ex rel. Little v. Twomey, 477 F.2d 767, 773 (7th Cir., 1973); Scott v. United States, 138 U.S.App.D.C. 339, 427 F.2d 609, 610 (1970). The standard followed in the third circuit is "whether counsel's performance was at the level of normal competency", *i. e.*, "the exercise of the customary skill and knowledge which

normally prevails at the time and place." Moore v. United States, 432 F.2d 730, 736–737 (3rd Cir., 1970); United States v. Hines, 470 F.2d 225, 231 (3rd Cir., 1972). That formulation has not been adopted in this circuit.

5. Testimony was also taken with respect to Thomas' claim of a beating on December 29, 1966. The court's finding adverse to Thomas has not been challenged on appeal.

508 (7th Cir., 1969), cert. denied 396 U. S. 914, 90 S.Ct. 233, 24 L.Ed.2d 191; United States v. Ragen, 323 F.2d 410, 412 (7th Cir., 1963). Courts have had difficulty in particular cases, however, in determining whether a prisoner plaintiff has stated a claim of deprivation of a federal constitutional right.

 Such a claim is not stated where plaintiff alleges no more than that he is dissatisfied as to the adequacy of treatment actually received for a particular injury or ailment. *Henderson, supra,* 409 F.2d at 508. Courts will not attempt to second-guess licensed physicians as to the propriety of a particular course of medical treatment for a given prisoner-patient. See Cates v. Ciccone, 422 F.2d 926, 928 (8th Cir., 1970).

 On the other hand, a claim of medical mistreatment rises to fourteenth amendment proportions when it asserts a refusal to provide essential medical care after a prisoner brings his medical complaint to the attention of prison authorities. (In the instant case we are not confronted with and do not express an opinion about whether the constitution requires prisons to provide preventive medical services not requested by inmates, *e. g.*, regular physical examinations.) In the ultimate determination whether medical care was in fact essential, the question would be, we think, whether it had been proved that a physician exercising ordinary skill and care at the time of the request for medical care would have concluded that the symptoms of the prisoner evidenced a serious disease or injury; that the potential for harm by reason of delay or denial of medical care was substantial; and that such harm did result. In deciding at the pleading stage whether a claim has been stated, the court must consider whether the factual allegations of the complaint suggest the presence of these factors. See Stiltner v. Rhay, 371 F.2d 420, 421, n. 3 (9th Cir., 1967), cert. denied 386 U.S. 997, 87 S.Ct. 1318, 18 L.Ed.2d 346, reh. denied 389 U.S. 893, 88 S.Ct. 21, 19 L.Ed.2d 212; Coleman v. Johnston, 247 F.2d 273 (7th Cir., 1957).

We also think that it is sufficient to allege facts which suggest that the medical care provided is so clearly inadequate as to amount to a refusal to provide essential care or is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition. See generally Cates v. Ciccone, 422 F.2d 926 (8th Cir., 1970); Mayfield v. Craven, 299 F.Supp. 1111, 1113 (E.D.Cal., 1969).

 Turning to the complaint at bar, plaintiff Thomas first complains of the medical treatment afforded for an ear wound. He alleges that although his medical record reveals that he is allergic to penicillin and although he brought this information to the attention of the medical staff, the inmate nurse gave him a shot of penicillin. He further alleges that when he subsequently had an allergic reaction to the penicillin, the prison doctor, without examining him, concluded that no further treatment was needed. He also claims that he was placed in unsanitary punitive confinement while sutures were in his ear, that the date of removal of the sutures was delayed for the period of punitive confinement (fifteen days at a maximum), and that the result of this treatment was that his ear became infected. He acknowledges that this infection was subsequently treated.

We conclude that Thomas' allegations concerning the administration of penicillin despite his known allergy to that drug and the allegations describing intentional delay in removing sutures while he was confined in unsanitary environs suffice to state claims for relief for intentional mistreatment likely to aggravate his condition. The district court erred in dismissing this portion of the complaint.

Thomas complains about the content of his meals which he alleges are 75% beans. He claims that he is allergic to beans; that he has informed prison authorities about this allergy; that his re-

quests for alternative meals have been denied; and that he has been denied medical treatment for his skin condition resulting from eating beans.

We conclude that the district court should have required defendants to answer Thomas' claim that prison authorities knowingly required him to choose between not eating at all or eating beans. Furthermore, his allegations concerning the refusal of the defendants to provide any medical treatment for his resulting skin condition should not have been dismissed.

Finally Thomas alleges that while confined in segregation, he began vomiting blood. He claims that despite his appeals for help, a doctor did not arrive for two hours. When he did arrive, the doctor prescribed medicine but would not X-ray plaintiff's chest. (Thomas had a chest X-ray the previous year.)

We conclude that the district court properly held that the allegations describing the vomiting incident fail to state a claim upon which relief can be granted. There is no allegation that the delay in receiving medical treatment resulted in substantial harm. The difference of opinion between the doctor and prisoner-patient about the necessity for an X-ray is not of constitutional proportions.

(b) *Inhumane Conditions in Punitive Confinement.*

Thomas alleges that the punitive segregation units are foul-smelling, filthy, overcrowded, infested with insects and rodents, and inadequately lighted, heated and ventilated; more particularly that he was confined in cells housing ten to eleven prisoners with dimensions of twenty-one feet by ten feet; that the cell floors are made of rough, cold, and damp concrete; that the cells have no hot water and only one toilet; that in winter it is so cold that ice forms on the cell's inner walls; that there are "roaches, ticks, millipedes, spiders, silverfish, centipedes, louses, and mice" in the cells; that each inmate is provided with one pair of pants, one shirt, one pair of thin cloth slippers, and four filthy blankets which are never washed; that only one meal per day is provided; that no exercise facilities are provided; and that the cell is enclosed by both a steel gate door and a wooden door, shutting out air and light.

Adams v. Pate, 445 F.2d 105 (7th Cir., 1971), decided appeals in two actions, one of which was brought by Miller, a plaintiff in the instant action. There we considered the conditions in disciplinary cells in the same penitentiary. We affirmed the dismissal of each complaint. It was held that Adams' claim was properly dismissed because the complaint contained only general conclusory allegations unaccompanied by specific averments. Miller failed to state a claim because he did not allege "conditions 'so foul, so inhuman and so violative of basic concepts of decency' to fall within the proscriptions of the Eighth Amendment. (citations omitted)" Adams v. Pate, *supra*, at 109. It appears that neither case was maintained as a class action. Depending upon whether the order of the district court in Miller's case specified that the dismissal was without prejudice, Miller may be barred by *res judicata* in the instant case from claiming that the conditions in disciplinary confinement are unconstitutional. See Rinehart v. Locke, 454 F.2d 313, 314 (7th Cir., 1971); 1B Moore's Federal Practice ¶ 0.409[1], pp. 1006–1007.

Here, however, the detailed allegations of cruel and unusual punishment appear also in the complaint of plaintiff Thomas, who was not a party to either action in Adams v. Pate. The action of the district court below consolidating Thomas' action with that of Miller, pursuant to Rule 42, F.R.Civ.P., does not deprive Thomas of his right to "a day in court" on this issue.

Adams v. Pate is distinguishable from the instant case in that the complaints there did not allege with specificity all of the conditions described in the complaint here; Adams alleged only that

the segregation unit was "unsanitary"; Miller did not specify the number of prisoners confined in each cell, nor did he describe the ice on the interior cell walls, the insects and rodents in the cells, the absence of hot water, the inadequate clothing and filthy blankets, and the lack of proper food and exercise.

We do not attempt to determine here what specific conditions, if proved, would be sufficient when viewed in their entirety, to entitle Thomas to relief for violation of his eighth amendment rights. It suffices to conclude, as we do, that it can not be said that Thomas can prove no set of facts in support of his claim which would establish that living conditions in disciplinary cells are so foul, inhumane, and violative of basic concepts of decency as to constitute cruel and unusual punishment. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

(c) *Denial of Release from Segregation until Confession of Guilt.*

■ The complaint describes two instances in which Thomas' release from segregation into the general population was conditioned upon his agreeing to write letters to prison officials. The requested content of these letters is not alleged. Thomas argues that making the extent of punitive confinement depend on admission of misconduct is a deprivation of rights.

Thomas relies upon cases holding that persons convicted of crimes may not be subjected to harsher punishment because of their refusal to plead guilty and to waive trial, *e. g.,* United States v. Wiley, 278 F.2d 500 (7th Cir., 1960). Even accepting the assertion that this principle applies with equal force to prison disciplinary proceedings, we think it inapposite here. There is no claim that the length of Thomas' confinement was extended by refusal prior to determination of guilt to waive rights to procedural due process or to admit that he had committed a rule infraction.

Instead, at most, it is alleged that prison officials considered Thomas' refusal to admit his misconduct subsequent to the determination of his guilt. We are not aware of nor has he cited any authority for the proposition that it is unconstitutional or an abuse of discretion for a judge, in sentencing, to consider whether the defendant accepts responsibility for his criminal acts following the return of the guilty verdict.

We conclude that the district court properly dismissed these allegations.

(d) *Due Process in Disciplinary Proceedings.*

Thomas argues that the district court erred in dismissing his allegations of denial of procedural due process in disciplinary proceedings. Although the *pro se* complaint and supplement thereto do contain numerous recitations about Thomas' incarceration in disciplinary cells at various times for infractions which he allegedly did not commit, it contains few affirmative allegations describing the disciplinary proceedings preceding these punishments. We cannot presume simply from the absence of such allegations that procedural due process was not afforded. Moreover, the district court properly dismissed Thomas' conclusory and general allegations that conduct reports filed by officers are presumed to be correct and that there is a practice of punishing black inmates on the basis of secret incriminatory notes written by white inmates.

The complaint does contain some specific allegations which deserve closer consideration. Thomas alleges that following an incident in 1963, he was interviewed by a "mob" of prison officials and was subjected to oral and physical harassment when he asked to be confronted with the accusing officer and complaining witnesses. He was sentenced to ten days in isolation. Thomas further alleges that in 1964 he was punished without being informed of the charges against him; he was placed in isolation for three days. The complaint describes another incident when he attempted to explain to the prison "disciplinarian" that conduct reports were being filed against him because of his pending lawsuits. He claims that he

was attacked by officials wielding black-jacks. Thomas' complaint at least suggests that as a result of this incident and ensuing events, he was confined in isolation for fifteen days and deprived of six months of statutory good time.

In Miller v. Twomey, 479 F.2d 701, 718 (7th Cir., 1973), this court held that in any case involving a "grievous loss," a prisoner is entitled at least to adequate and timely written notice of the charge, a fair opportunity to have written notice of the charge, a fair opportunity to have witnesses called or interviewed, a fair opportunity to explain, and an impartial tribunal. Thomas' complaint adequately alleges deficiencies in the disciplinary proceedings described above, when measured against these minima.

The question remaining is whether the punishment imposed was sufficiently severe to bring the due process requirement into play. We recognize that prisoners in the general population live without many of the amenities and freedoms taken for granted outside prison walls. But confinement in isolation often entails deprivation of remaining highly valued rights and privileges enjoyed by inmates in the general population.

The alleged deprivation of statutory good time and punitive confinement for fifteen days clearly constitute a "grievous loss." *Miller, supra,* at 715; Knell v. Bensinger, 489 F.2d 1014, p. 1018 (1973).

In order to determine whether confinement in isolation for three days or ten (each of which is alleged) is sufficiently severe, the conditions of confinement must be scrutinized. See *Miller, supra,* 479 F.2d at 717. For present purposes, we must accept as true Thomas' allegations, set out in part 4(b) of this opinion, concerning the conditions of con-

finement. We conclude that a prisoner so confined for three days or more (and possibly for fewer) suffers a "grievous loss."

Furthermore no extraordinary circumstances have been alleged which indicate a need for "prompt decisive action" by the state. *Miller, supra,* at 717.

Accordingly, the district court erred in dismissing these specific allegations concerning denial of procedural due process in disciplinary proceedings.[6]

(e) *Denial of Access to the Court.*

Thomas argues that he stated a claim by alleging that prison officials confiscated his legal materials intended for the courts and refused to mail his letters to attorneys. In addition, Thomas brings to our attention his allegations regarding postage.

Several of these allegations were contained in documents filed with the district court prior to entry of the order granting defendants' motion to dismiss; we consider these allegations first. The complaint and the accompanying "supplement" do not allege with particularity any incident when officials confiscated or refused to mail letters or legal documents.

Thomas alleges that he was required to pay an amount of postage which in fact he could afford; but that inmates confined in other Illinois prisons do not have to pay postage. This fails to state a claim for denial of reasonable access to the courts since Thomas could afford to pay the postage for his documents. Furthermore, even when liberally construed, Thomas' complaint fails to state a claim under the equal protection clause. He has not alleged whether the other prisons providing inmates with postage are maximum, medium, or minimum security institutions, nor whether earnings or allowances are comparable.

---

6. Thomas' complaint, assuming ultimate favorable findings, would be a predicate for injunctive relief, which he seeks. See Adams v. Carlson, 488 F.2d 619, p. 625 (No. 73–1268, August 23, 1973). He also asks damages. It would be inappropriate to apply *Miller* retroactively so as to award damages against the defendants for past failure to comply with *Miller,* if their acts were in good faith. See *Miller, supra,* 479 F.2d p. 719, n. 38.

It may be that free postage is offered only to those in a class which is distinguishable from Thomas' on a rational basis.

Thomas further alleges that he was told by a prison official that he must provide a copy of a legal document to the warden before it would be mailed to the court. The outcome is not alleged, nor is there a claim that the requirement reflects a general policy at the prison. Failure to address this claim in argument indicates that it is not seriously pressed, and we do not reach it.

After the entry of the order dismissing in part the original complaint, Thomas filed a second complaint entitled "complaint for relief for injuries of suppression." This document contains the allegations that particular legal papers were confiscated and not mailed.

Under Rule 15(a), F.R.Civ. P., a party may amend its pleading once as a matter of course prior to service of a responsive pleading. In this circuit, a motion to dismiss is not such a responsive pleading. Fuhrer v. Fuhrer, 292 F.2d 140, 141–142 (7th Cir., 1961). Accordingly, Thomas then had the right to amend his original complaint without leave and the allegations in the "complaint . . . for suppression" should have been considered as a part of his pleadings. From the failure of plaintiffs to attempt to adduce evidence in support of these allegations at trial and from the failure of defendants to file a responsive pleading as required under Rule 15(a), it appears that this amendment to the pleading was overlooked. On remand, the district court should establish an orderly procedure permitting defendants to respond to the "complaint for relief of injuries of suppression."

(f) *State Furnished Apparel.*

Plaintiff Thomas alleges that inmates at the prison who are under forty are not given free long underwear, while inmates over forty, as well as inmates of any age at other Illinois prisons, are supplied with free long underwear. We can not say that the differences in treatment between older and younger inmates within the prison are arbitrary. Furthermore Thomas has not alleged whether the other prisons providing free long underwear to all prisoners are maximum, medium, or minimum security institutions nor whether, at the other prisons, a prisoner's earnings or allowances are comparable. It may be that free long underwear is made available only to a class which is distinguishable on a rational basis. Also, physical conditions in the other prisons may be different so that inmates confined therein have a greater need for long underwear. We conclude that Thomas' general allegation does not raise a constitutional claim.

5. *Summary.*

Plaintiffs are entitled to a new trial of the issues dealt with in part 1 of this opinion. The complaint of Thomas is to be reinstated with respect to the claims determined to have been erroneously dismissed in parts 4(a), (b), and (d) of this opinion, and further proceedings should be had on those claims. As indicated in part 4(e) of this opinion, a supplementary complaint of Thomas appears to have been overlooked. It should be deemed an amendment properly before the court, and further proceedings had accordingly.

The judgment appealed from is reversed, and the causes remanded for further proceedings consistent with this opinion.

KILKENNY, Senior Circuit Judge (concurring and dissenting):

The record, in my opinion, supports the district court's finding that appellants failed to prove an existing pattern of racial segregation or discrimination in connection with prisoner cell assignments. Consequently, I would not disturb that finding. Moreover, I do not believe the Thomas charge relative to appellee's alleged failure to provide adequate medical treatment is sustained by the evidence. In my view, appellee's conduct in this area did not amount to a

refusal to provide essential medical care, nor was it so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate appellant's condition.

Otherwise, I fully concur in the majority opinion.

## ON PETITION FOR REHEARING

In seeking rehearing, defendants rely, with respect to the issue decided in Part 1 of the opinion, Racial Discrimination in Composition of Cells, on O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) decided by the Supreme Court after our decision in this case.

Defendants claim that here, as in O'Shea, the complaint failed to allege an actual case or controversy with respect to this issue.

The complaints here did allege that the defendants have practiced racial discrimination by requiring plaintiffs to occupy cells with other black inmates and have refused to integrate such cells thereby depriving plaintiffs of their civil rights and equal protection. We not only treated the complaints as alleging an intentional practice of racial segregation, but concluded that the plaintiffs had established a prima facie case and that the burden shifted to defendants.

■■■ Defendants' present point, seeking to rely on O'Shea, is that a black inmate's allegation that the prison officers intentionally practice racial segregation in making cell assignments does not fulfill the "real injury," case or controversy, requirement of Article III of the Constitution. They suggest that it is essential for a black inmate specifically to allege that he had been refused permission to cell with a person of another race, or had suffered some other "specific" injury.

In O'Shea, plaintiffs were black citizens and white citizens of Cairo, Illinois. The complaint alleged that defendants, a magistrate and judge, were ad-ministering the criminal justice system in a racially discriminatory manner with respect to sentencing and other matters. Although some of plaintiffs had formerly been defendants and allegedly subjected to the discriminatory practices, none was currently so, and "the prospect of future injury rests on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners."

The Court held that "the threat of injury from the alleged course of conduct they attack is simply too remote to satisfy the 'case or controversy' requirement and permit adjudication by a federal court." At 498, 94 S.Ct. at 677.

We conclude that the O'Shea holding does not preclude jurisdiction of a claim by a black inmate of a prison, currently living in a racially segregated cell, that defendant prison officials intentionally maintain racially segregated cells. Placing and keeping him in that cell for that purpose is the present injury which was lacking in O'Shea. There is nothing remote about the impact of intentional segregation on plaintiffs, if that policy exists, for they are compelled to live from day to day and night to night in the assigned places.

That there is a present injury to an inmate, intentionally segregated because of his race, is particularly clear if the inmate is black. Because of the relatively small size of the prison community, its closed nature, and the numerous facets of prison life subject to regulation, any racially discriminatory action by prison officials is likely more effectively to create a badge of inferiority for black inmates than would necessarily attach to minority residents of a city as the result of discriminatory action outside prison walls. Indeed plaintiff Miller's *pro se* complaint explicitly alleged that the maintenance of a segregated institution "foster[s] an atmosphere of racial inferiority . . . to the detriment of the Negro inmate."

Defendants point to certain testimony by Miller and seem to suggest that it refutes his claim of injury. As we read it, the testimony was that it would not make any difference to Miller whether his cellmates were white or black. We do not view this testimony as ·inconsistent with a claim that he was injured by *enforced* and intentional racial segregation.

Similarly, while the fact that plaintiffs appear not to have made a request to be assigned to an integrated cell may, in the course of trial, have some bearing, negatively, on the proof of the existence of an intentional policy of racial segregation, we think it does not destroy their claim that they are injured by such policy if it is shown to exist.

The petitions for rehearing, both on the part of defendants and of plaintiff Thomas, are denied.