In the Matter of L. A. M., Appellant,

v.

STATE of Alaska, Appellee.

No. 2221.

Supreme Court of Alaska.

March 15, 1976.

Herbert D. Soll, Public Defender, Phillip P. Weidner, Asst. Public Defender, and R. Collin Middleton Anchorage, Alaska, for appellant.

Avrum M. Gross, Atty. Gen., Juneau and Larry R. Weeks, Asst. Atty. Gen., Anchorage, for appellee.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and BURKE, Justices.

OPINION

ERWIN, Justice.

L.A.M. seeks review of the superior court's order dated July 26, 1973, declaring her a delinquent [1] child for violation of AS 09.50.010,[2] i.e., willful failure to comply with certain court orders made after a prior adjudication that she was a child in need of supervision.[3]

In order to understand L.A.M.'s arguments and place her situation in context, it will be necessary to set out her history at some length.

L.A.M. was born in Canada in 1958 and was adopted by the M's shortly thereafter. The M.'s soon were divorced and Mrs. M. moved with L.A.M. to Alaska. In 1971 Mrs. M. married Mr. C. and retired from work, intending to spend more time with L.A.M. Difficulties arose almost immediately with L.A.M. neglecting to return home after staying with friends.

L.A.M. began a consistent pattern of running away in the Spring and Summer

of 1972. During this period two petitions were filed seeking to have her declared a child in need of supervision, but in both cases the petitions were dismissed on stipulation and the matter handled informally.[4] On November 2, 1972, a new petition was filed. At the hearing L.A.M. admitted the allegations of the petition and was declared a child in need of supervision. She was ordered detained at the McLaughlin Youth Center pending adjudication.

On December 12, 1972, the disposition hearing was continued and L.A.M. was released to her parents. One week later the court was informed that she had run away. A pick-up order was issued and the minor was brought back to court on December 27, 1972, at which time she was detained pending disposition. The disposition hearing was finally held on January 11, 1973. Upon listening to testimony, the Master for the Family Court filed his recommendation that the minor be "released to her parents." A superior court judge adopted the finding and executed a release.

On March 19, 1973, L.A.M. was brought back to court by an intake officer who in-

1. AS 47.10.010(a)(1) provides in relevant part:
(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the minor (1) violates a law of the state, or an ordinance or regulation of a political subdivision of the state . . ..

2. AS 09.50.010 provides in relevant part:
*Acts or omissions constituting contempt.* The following acts or omissions in respect to a court of justice or court proceedings are contempts of the authority of the court:
(5) disobedience of a lawful judgment, order, or process of the court . . ..

3. AS 47.10.290 provides in relevant part:
In this chapter, unless the context otherwise requires,
(7) "child in need of supervision" is a minor whom the court determines is within the provisions of (AS 47.10.010(a)(2), (3), (4), and (6)). [Matter in parentheses supplied.]

AS 47.10.010(a)(2), (3) and (6) respectively provide:
[B]y reason of being wayward or habitually disobedient is uncontrolled by his parent, guardian or custodian;
[I]s habitually truant from school or home, or habitually so conducts himself as to injure or endanger the morals or health of himself or others;
[A]ssociates with vagrant, vicious or immoral people, or engages in an occupation or is in a situation dangerous to life or limb or injurious to the health, morals, or welfare of himself or others . . ..

4. Children's Rule 4(d) provides:
*Informal Disposition.* If the intake officer, after investigation, believes that in the best interest of the child the matter should be handled on an informal basis, he may thereafter refrain from filing a petition and shall thereafter on behalf of the court, counsel with the child and parents, guardian or custodian, and with their consent and cooperation establish such informal supervision or disposition of the child matter as the circumstances may require.

formed the court that she had "been a runaway almost constantly since the time the court released her." The intake officer then filed a petition with the court alleging that the minor was a "child in need of supervision" by virtue of having been truant from school in violation of AS 47.10.-010(a)(3) and AS 14.30.010 (truancy).[5] At the hearing the court was informed that Mrs. C. had obtained a child psychiatrist who had met with the child and her mother, and together they had worked out some program of counseling. The parties agreed that L.A.M. would be placed in a foster home during a period of counseling and the judge accepted a stipulation to that effect. Having previously explained to L. A.M. that if she violated a court order she could be held in contempt of court and incarcerated, the judge informed the child that she was not to leave the foster home without contacting her psychiatrist, her social worker, or her mother. She agreed. The minor was released from McLaughlin on March 31, 1973, and placed in a foster home. She ran away on April 2, without notification, and was not apprehended until May 4.

A hearing was held on May 14, 1973, at which time L.A.M. was charged with contempt of court by the intake officer. Because of the uncertainty in this area, the trial court appointed the public defender to represent her. On May 17, 1973, the hearing resumed. The state argued that a child in need of supervision could not thereby be held in contempt of court and incarcerated, but that a child guilty of "criminal contempt" could on that basis be adjudicated a "delinquent child" and thereafter institutionalized. The State, therefore, moved to dismiss the petitions, alleging contempt of court and substituting a petition of alleged delinquency. The court

denied the motion but permitted the State to file an amended petition alleging as a separate count an act of delinquency predicated upon "criminal contempt."

A petition alleging delinquency was filed on May 23, 1973, at which time a hearing was held. In responding to the petition L. A.M. denied the allegations and requested a trial. Pending trial, she was placed at the Alaska Children's Services receiving home. A written order was entered on June 8, 1973, specifically setting out the conditions under which L.A.M. would reside at the receiving home pending her adjudication hearing. Specifically, it provided that "[T]he child is not to remain away from the Anchorage Children's Christian Home overnight without the permission of the appropriate adult authorities of the home."

On July 26, 1973, an intake officer filed a petition for revocation of conditions of release pending L.A.M.'s adjudication hearing. In part, the petition stated that she had left the receiving home without permission on July 3, 1973, and remained away until July 24, 1973. A detention hearing was held on July 26th, and at the hearing L.A.M., through her counsel, admitted the allegations of the petition of alleged delinquency based on violation of a court order filed on May 23, 1973. L.A. M.'s counsel made it clear that the minor was only admitting the facts and reserving the right to litigate the legal consequences of those facts.

The court then proceeded to a consideration of the petition for revocation of conditions of release pending adjudication hearing filed on July 26, 1973. Upon admitting the allegations of this petition as well L.A.M. requested through her attorney that a disposition hearing be scheduled within thirty days.

---

5.  AS 14.30.010 provides in relevant part:
    *When attendance compulsory.* (a) Every child between seven and 16 years of age shall attend school at the public school in the district in which the child resides during each school term. Every parent, guardian or other person having the responsibility for or control of a child between seven and 16 years of age shall insure that the child is not absent from attendance.

At the disposition hearing held on August 28, 1973, and on August 31, 1973, two experts testified on behalf of the minor and two testified on behalf of the State. The expert testimony pointed up the substantial differences of opinion both as to principle and policy that exists regarding runaways and their treatment. After considering all of the evidence, the court accepted the recommendation of the Division of Corrections and ordered the minor institutionalized, but deferred execution of the order for a period of sixty days to give L. A.M. one more opportunity to establish that she could be rehabilitated within the community. During the deferred period L.A.M. was assigned to Sheila Lankford of the Division of Corrections Probation Department.

On November 2, 1973, the superior court, on the request of Ms. Lankford, vacated the deferred order of institutionalization and placed the child on regular probation, having been advised that L.A.M. was functioning effectively within the community while living at home. On November 5, 1973, the minor ran away but returned of her own accord on November 7. Two days later she ran away again and remained away until December 5, 1973, when she was apprehended by the police. On December 6, 1973, Ms. Lankford petitioned to revoke the minor's probation. At the hearing on this matter held on December 18, the superior court granted the petition to revoke probation but reinstated it on new conditions in light of a request by Ms. Lankford that the minor not be institutionalized. It was agreed that the child would reside in the Alaska Children's Services Receiving Home.

On March 18, 1974, Ms. Lankford filed a further petition seeking revocation of probation. In it she alleged that on February 20, 1974, the minor ran away from the receiving home and remained away until March 16, 1974, when she was apprehended by the police. At the hearing on the petition, held on March 22, 1974, the court found the minor had violated the conditions of her probation and had run away from the receiving home. The court considered the minor's objections presented by her attorney and, after considering the evidence and the argument of the parties, directed that the minor be institutionalized.

L.A.M. seeks to have her adjudication of delinquency set aside on two grounds. She contends that both as a matter of statutory interpretation and constitutional law, a child in need of supervision may not be prosecuted for criminal contempt; or, in the alternative, if such a prosecution is allowable, such prosecution cannot result in incarceration. Upon discussing the nature of contempt in this case, each of these grounds will be dealt with in order.

Before a party may be held in criminal or civil contempt for failure to abide by a court order, certain elements must be established: (1) the existence of a valid order directing the alleged contemnor to do or refrain from doing something and the court's jurisdiction to enter that order; (2) the contemnor's notice of the order within sufficient time to comply with it; and in most cases, (3) the contemnor's ability to comply with the order; and (4) the contemnor's willful failure to comply with the order.

The distinction between criminal and civil contempt is generally phrased in terms of whether the character and purpose of the contempt is "remedial" or "punitive."

In *Johansen v. State* [6] we used a balancing test in determining that the failure to pay child support was criminal rather than civil contempt. We did so because incarceration was imposed for a fixed period under AS 09.50.020 [7] to punish a completed act rather than to coerce future con-

6.   491 P.2d 759 (Alaska 1971).

7.   See n. 2, *supra*.

duct pursuant to AS 09.50.050.[8] Specifically, the court held that where the contempt power was invoked to punish the alleged contemnor for "past, willful, flouting of the court's authority" pursuant to AS 09.50.010(5) (cf. AS 09.50.020), contempt was criminal, but where the contempt proceeding was instituted to "coerce future conduct" pursuant to AS 09.50.050, the contempt is civil.

Applying that distinction here, the contempt order issued by the court would obviously be classified as "criminal." Were L.A.M. an adult, her failure to abide by court orders would be characterized as a "crime" under AS 09.50.010(5). Hence, L.A.M. could properly be declared a delinquent under AS 47.10.010(a)(1) after a proceeding in the Children's Court.

L.A.M. grounds her constitutional argument in *Breese v. Smith*,[9] where this court ruled that the right to liberty set out in Art. I, Sec. 1, of the Alaska State Constitution [10] guarantees every Alaskan regardless of age " . . . total personal immunity from governmental control: the right to be let alone . . .," which L.A.M. contends the supreme court qualified only to the extent that it " . . .

must yield when [it] intrudes upon the freedom of others. . . . " Therefore, she continues, a citizen's right to liberty as enunciated in *Breese, supra,* (bolstered by the more recently enacted "right to privacy")[11] cannot be infringed by preventing her from doing anything that does not injure a specific definable victim. Consequently, L.A.M. concludes since her conduct, i.e. running away from home and foster home placement, did not injure anyone (except perhaps herself, which she contends has not been proved), it necessarily follows that it cannot constitutionally be interfered with by the State because there is no compelling state interest to justify such an interference.

L.A.M. assumes that the only interest to be protected by legislation in this area is that of the children. This is simply not the case. The parents' interest as well as the State's must be considered.[12]

Proceedings against children alleged to be in need of supervision are in substance and effect custody disputes where the contestants are parent and child, and the parent appeals to the court to vindicate and enforce his custody rights in the child against that child.[13] Viewed in

---

8. AS 09.50.050 states in relevant part:
When the contempt consists of the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he has performed it.

9. 501 P.2d 159, 168–170 (Alaska 1972).

10. Art. I of the declaration of rights of the Alaska Constitution, § 1, provides:
*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

11. Alaska Constitution, Art. I, § 22, provides:
*Right of Privacy.* The right of the people to privacy is recognized and shall not be

infringed. The legislature shall implement this section.

12. The U. S. Supreme Court has on a number of occasions held that a parent's "right" to the custody and control of his child was constitutionally protected. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1932).

13. While there is much discussion of parental rights in reported cases, few cases attempt to define those rights making discussion difficult. A careful review of the literature, including case law, treatise and law review, indicates that the following have

this light, the statutes creating the status "child in need of supervision" provide a judicial remedy and discourage resort to self-help and the attendant risk of violence.[14]

Thus, before L.A.M. can sustain her case that the child in need of supervision procedure, including the invocation of the court's contempt power to enforce orders made pursuant to it, is an unconstitutional invasion of her liberty and privacy, she must first establish that her mother has no legally enforceable right to her custody and the State thus has no right to enforce such an order. We note at the outset, however, that there is more to the parent-child relationship than simple custody. It is love and trust and a responsibility toward each other which cannot be defined legally. It is impossible to discuss severing this relationship without considering the heartache and anguish of the parents who must ultimately live with themselves and the decision after the child reaches adulthood. Further, the consideration of such an issue must accept the limitations of the State to be a parent; good intentions are not adequate substitutes for the day-to-day relationship which we have come to accept as necessary to the growth of children into responsible adults. True, like all legal rights, a parent's right to the custody of his child is not absolute and may be lost through divorce,[15] by conduct depriving the child of the necessities of life,[16] by abandonment,[17] by the child's emancipation,[18] or, subject to constitutional limitations, where the welfare of the child requires a limitation or termination of parental rights.[19]

been listed as "parental rights" protected to varying degrees by the Constitution:

(1) Physical possession of the child which, in the case of a custodial parent includes the day-to-day care and companionship of the child. In the case of a non-custodial parent, possession is tantamount to the right to visitation.

(2) The right to discipline the child, which includes the right to inculcate in the child the parent's moral and ethical standards.

(3) The right to control and manage a minor child's earnings.

(4) The right to control and manage a minor child's property.

(5) The right to be supported by an adult child.

(6) The right to have the child bear the parent's name.

(7) The right to prevent an adoption of the child without the parents' consent.

Of these so called residual parental rights, those that remain after custody is placed in another include the right to consent to an adoption and to withhold consent to prevent an adoption, the right to visitation and the right to have the child bear the parents' name. See the discussion in Burt, Forcing Protection on Children and Their Parents, 69 Michigan 1259 (1971); Dobson, The Juvenile Court and Parental Rights, 4 Family Law Quarterly 393 (1970); Young, The Problem of Neglect: The Legal Aspects, 43 Journal of Family Law 29 (1964); Note, Child Neglect: Due Process for the Parent, 70 Col.L.Rev. 465 (1970).

14. By withdrawing court assistance (and police assistance) from embattled parents, the state is not inducing compromise but may encourage violence, since parents have the right under Alaska law to physically control their children. See AS 11.15.110(1) as interpreted in *State v. England*, 220 Or. 395, 349 P.2d 668 (1960), and compare the civil liability of parents for disciplining their children which is discussed in *Hebel v. Hebel*, 435 P.2d 8, 14–15 (Alaska 1967).

15. AS 09.55.205 gives a court in a divorce action the right to provide for the custody of the children.

16. See AS 47.10.010(a)(5) which, when read in conjunction with AS 47.10.080(c) and AS 47.10.290(3), permits the state to take custody of a child who "lacks proper parental care by reason of the faults, habit or neglect of his parent, guardian or custodian."

17. See AS 47.10.010(a)(4), which authorizes the state to take custody of a child who has been abandoned.

18. A child is emancipated as a matter of law when he or she reaches the age of majority which in Alaska is 19 years of age; AS 25.20.010. *See R.L.R. v. State*, 487 P.2d 27 (Alaska 1971).

19. *Turner v. Pannick*, 540 P.2d 1051, (Op. No. 1189, 1975); *In the Matter of the Adoption of K. S.*, 543 P.2d 1191, (Op.No.1219, 1975).

L.A.M. was given an opportunity to show any of the foregoing as a defense to a finding that she was a "child in need of supervision" or, subsequent thereto, to a finding that she had committed criminal contempt of court and was therefore delinquent by violating orders regarding her placement; but she failed to do so.

Runaway children of L.A.M.'s age are generally incapable of providing for or protecting themselves. As a result, police spend a substantial amount of time protecting these youths from those who would prey upon them, as well as protecting the community from those who are ultimately driven to criminal activity to provide themselves with the necessities of life.

Various other social agencies also expend considerable efforts attempting to protect and shelter runaways in an effort to provide both an alternative to criminal activities and counseling in lieu of that they received from their parents. Without question these children's matters are of broad public interest and concern. They go to all aspects of the physical and mental well being of such children.[20]

The family, school, social agency and police resources allocated to aid the runaway are enormous. In this case, the child had continuing aid and support of (1) her mother and step-father, (2) a private psychiatrist hired by her mother, (3) counseling with social workers in Division of Family and Children's Services, (4) probation officers in Division of Corrections, (5) school counselors, (6) psychologists and psychiatrists from Langdon Clinic, (7) Alaska Youth Advocates, (8) group home counselors, (9) her court-appointed attorney, and (10) the court. To assert that the State has no interest in this child is to deny that the function of government is to protect its citizens. All of this presupposes the heartache and anguish of the parents, who in the first instance have been unable to deal with this problem but who must also live with the solution.

This court has previously found that there is sufficient State interest to justify restrictive measures on much less substantial grounds.[21] Further, this court has noted that distinct government interests with reference to children may justify legislation that could not properly be applied to adults.[22]

■ The State has a legitimate interest in protecting children from venereal disease, from exposure to the use of dangerous and illicit drugs, from attempted rape, and from physical injury, all of which occurred in this case. Doubtless the State will never be entirely successful in its efforts. It does, however, have the right and obligation to *try* to protect its young people from such conditions.[23] The test set out by this court in *Ravin v. State*,[24] is whether the means chosen by the State are closely and substantially related to an appropriate government interest. Clearly they are here.

■ While it may be argued that the necessary "supervision" contemplated by the statute is simply the furnishing of food, clothing, shelter and schooling in lieu of that which would otherwise have been provided by a parent, this argument begs the question, for the purpose of the supervision or treatment contemplated by the creation of the child in need of supervision and its predecessor non-criminal delinquency was reintegration of the child into her family and resumption of parental custody including parental control (cf. AS 47.10.-

20. *In Re G.M.B.*, 483 P.2d 1006 (Alaska 1971); *Wagstaff v. Superior Court*, 535 P.2d 1220 (Alaska 1975).

21. *Kingery v. Chapple*, 504 P.2d 831 (Alaska 1972).

22. *Ravin v. State*, 537 P.2d 494 (Alaska 1975).

23. In the analogous equal protection argument concerning ". . . economics and social welfare, a State does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491.

24. 537 P.2d 494 (Alaska 1975).

280). Thus, the State's efforts regarding the child are not directed solely at providing an alternate living situation (as they are in a true case of dependency) but at putting the child back in her own home. The reestablishment of her mother's custody and supervision over her and any foster placement is merely a means to that end, not an end in itself. Thus, by rejecting these efforts L.A.M. defeats, or at least slows, this reintegration process and thereby prejudices her mother's right to her custody and control, subjecting herself to the more severe sanction contemplated by AS 09.50.020.

We note that L.A.M.'s primary argument in this case is that as a child in need of supervision whose conduct from the inception of the case to the present has not changed, she may not be placed in a closed setting, i. e. one where the doors may be locked. However, the cases upon which L.A.M. relies proceed to a different point, namely that the child should not be placed in a state training school. In Colorado, California, Illinois and New York,[25] children in need of supervision can at the first instance be placed in juvenile halls or youth centers, i.e. places with locked doors, but cannot be placed at the state training school, i.e. maximum security institutions. The McLaughlin Youth Center in Anchorage is more the equivalent of a juvenile hall than it is a state training school. It should be noted that Alaska has contracts with Colorado and California to place Alaska delinquents who are too sophisticated for McLaughlin in the state institutions in those states. Thus L.A.M. is not to be placed at either the California or Colorado training schools; she is threatened with placement at the McLaughlin Youth Center.

■■■ Substantial evidence was introduced during the many hearings of this case regarding the population at the McLaughlin Youth Center. Based upon that evidence, it is clear that the kind of children who are extremely agressive, and extremely hardened in delinquency, are not treated at McLaughlin Youth Center but are sent outside for placement at schools in Colorado and California under contract with the State of Alaska. While the population at McLaughlin is made up at the present time exclusively of "delinquents," the evidence introduced at trial convinces us that while delinquency in some form is a prerequisite to gaining admission to McLaughlin, it is not the real reason that the child is at McLaughlin. The overwhelming majority of delinquents with strong family ties are treated in the community. Those delinquents who end up at McLaughlin are by and large there for the same reason that L.A.M. may be there, namely an unwillingness to remain at home or a home substitute and heed parental or a custodian's regulations. Based upon the evidence, it appears that L.A.M. and other chronic runaways would not be distinguishable in sophistication, exposure to criminal activity, etc., from the average child in the population at McLaughlin and that therefore the reasoning of the cases cited by L.A.M. should not apply to Alaska.

■■■ Whether we characterize L.A.M. as a delinquent child, a child in need of supervision, a dependent child, or merely a child whose custody is disputed in a domestic relations proceeding, the court has authority, upon extending all procedural safeguards, to make orders affecting her custody. It is argued, however, that this is a situation where the court has no power to enforce its order, and thus the court must release L.A.M. This view is contrary to the inherent power of the court to enforce its orders or decrees.[26] While the court

---

25. *In re Presley*, 47 Ill.2d 50, 264 N.E.2d 177 (1970); *Matter of Tomasita N.*, 30 N.Y.2d 927, 335 N.Y.S.2d 683, 287 N.E.2d 377 (1972); *C. v. Redlich*, 32 N.Y.2d 588, 300 N.E.2d 424 (1973); Cal.Welf. and Inst. Code, §§ 601, 730, 777 (West 1972).

26. Alaska Const. Art. IV, § 1, provides in part:
    The judicial power of the State is vested in a supreme court, a superior court, and the courts established by the legislature. See also *Ex Parte Robinson*, 86 U.S. (19

may have limitations on its power to act, there are only due process limitations on its authority to compel enforcement of its orders. Hence, we reject the argument that the superior court lacked the authority to enforce specific orders against L.A.M. in this case.

■ The lower court determined that L.A.M. would not abide by any orders it entered regarding her supervision under AS 47.10.080(j). This behavior constitutes willful criminal contempt of the court's authority; were she an adult, her actions would be characterized as a "crime" under Alaska statutes. She was, therefore, properly declared a delinquent and subject to those sanctions available for the correction of a delinquent minor's behavior. Certainly, conciliation should precede coercion; and if coercion is necessary, mild sanctions should first be tried before more severe sanctions are imposed. However, where mild sanctions fail, the court's orders must be enforced and severe sanctions should be imposed if necessary. In the instant case, all available sanctions, save institutionalization, were tried and found unsuccessful. Thus, the lower court determined that it

had no choice but to order L.A.M. institutionalized.

In affirming this decision, we note that the trial judge was most innovative in fashioning a necessary remedy for a situation not covered by statute.[27] The very nature of the problem, however, calls for legislative overhaul of the statutes in this area, for the trial court's remedy is not easily modified to cover other situations where there is no statutory guidance.

BOOCHEVER, Justice, with whom RABINOWITZ, Chief Justice, joins, concurring.

I concur in the court's opinion based on the last three paragraphs thereof. I would not reach the other issues discussed in the opinion. Protection of parental rights to care, custody and supervision do not seem to me to be an appropriate rationale for placing a child in an institution. In my opinion, the court's efforts were devoted primarily to furthering the welfare of the child, a subject in which the state does have an interest.[1] There was ample testimony to indicate that L.A.M.'s conduct was harmful to her.[2]

Wall) 505, 510, 22 L.Ed. 205, 207 (1874); *In re Shortridge*, 99 Cal. 526, 528, 34 P. 227, 229 (1893); Frankfurter and Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts —A Study in Separation of Powers, 37 Harv. L.Rev. 1010, 1017–1022 (1924); Goldfarb, *The Contempt Power*, 37–40 (Columbia University Press 1963).

27. The trial judge was a model of patience and fairness in this extremely difficult case. Further, we are indebted to him for his scholarly memorandum opinion which aided in the preparation of this opinion.

1. The state's power to act in support of the welfare of children is exemplified by such statutory enactments as compulsory education (AS 14.30.010 et seq.); financial assistance for dependent children (AS 47.25.-310 et seq.); protective laws as to the employment of children (AS 23.10.325 et seq.); minimum age of consent for marriage (AS 25.05.171); prohibition of the use of alcohol and tobacco by minors and of the sale of either substance to minors (AS 04.15.-050 et seq. and AS 11.60.080); punishment for statutory rape (AS 11.15.120); con-

tributing to the delinquency of a minor (AS 11.40.130); and for lewd or lascivious acts toward children (AS 11.15.134).

In *Anderson v. State*, 384 P.2d 669, 671 (Alaska 1963), this court stated that the purpose of the statute punishing acts which contribute to the delinquency of a minor is "to protect all children under the age of 18". In *Hanby v. State*, 479 P.2d 486, 498 (Alaska 1970), the court held that the state can enact statutes to protect the juveniles— to prevent as well as punish delinquency. In *Hanby*, the court found that material which was not so obscene as to be proscribed for the general population could be forbidden to minors. Children who were judged to be in a harmful environment were removed from their home in *In re P. N.*, 533 P.2d 13 (Alaska 1975). The court determines child custody in divorce proceedings according to the welfare and best interest of the child. *Horton v. Horton*, 519 P.2d 1131, 1132 (Alaska 1974); *Nichols v. Nichols*, 516 P.2d 732, 734 (Alaska 1973); *Carle v. Carle*, 503 P.2d 1050, 1052 (Alaska 1972).

2. While a runaway, L.A.M. was truant from school; was allegedly the victim of a

On the basis of the record, I do not believe that we can conclude that police spend countless hours protecting the community from anti-social conduct of runaway children. Recent studies indicate that status offenders (such as runaways) are not a source of general harm to others as contrasted with children who have committed offenses which, if perpetrated by adults, would be crimes.[3] I concur in the opinion since I believe that the state has an interest in the welfare of children justifying the entry of appropriate orders. In cases involving status offenders, only after all else fails, should placement in a closed setting be justified. But under the facts of this case, the trial judge had no alternative.

RABINOWITZ, Justice (concurring).

Although I am in agreement with the court's disposition of this appeal, I think it appropriate to answer appellant's contention that our prior decisions precluded the superior court from institutionalizing L.A.M. This contention is grounded upon *In re E.M.D.*, 490 P.2d 658 (Alaska 1971), where we rejected the argument that under Alaska's statutes a minor who has been adjudicated a child in need of supervision may be institutionalized by the state. Upon analysis of the relevant statutes, we concluded that " . . . the legislature has authorized institutionalization only when the child is found to be a delinquent minor."[1] Thus, if the superior court in the case at bar had institutionalized L.A.M. because she had been adjudicated a child in need of supervision, such action would have been erroneous under *E.M.D.*

But here L.A.M.'s status was not merely that of a child in need of supervision; the scope of her future conduct had been limited by the superior court's order. By virtue of this order L.A.M. was, as the state argues, essentially on probation.[2] The majority notes that the superior court found that L.A.M. had violated the conditions of her probation by running away. The majority then observes that

> Were L.A.M. an adult, her failure to abide by court orders would be characterized as a 'crime' under AS 09.50.-010(5). Hence, L.A.M. could properly be declared a delinquent under AS 47.-10.010(1) after a proceeding in the Children's Court.

I thus conclude that what essentially transpired below was that the trial court found a violation of the conditions of probation which it imposed pursuant to its determination that L.A.M. was a child in need of supervision, and ordered L.A.M. incarcerated.[3] In my view, *E.M.D.* did not prohibit the superior court from ordering the institutionalization of L.A.M. in the circumstances of this case.

rape as reported in a call to the police; contracted gonorrhea; suffered an injured jaw and broken teeth from a fall, which injuries had not received medical attention.

3. Clarke, Stevens H., "Some Implications for North Carolina of Recent Research in Juvenile Delinquency," Journal of Research in Crime and Delinquency, January 1975.

1. *In re E.M.D.*, 490 P.2d 658, 659 (Alaska 1971). In E.M.D., after finding the minor to be a child in need of supervision, the trial court committed E.M.D. to the custody of the Department of Health and Welfare and directed the Department to place her in a correctional or detention facility.

2. AS 47.10.080(j) provides in part:
   If the court finds the minor is a child in need of supervision it shall make any of the following orders of disposition for his supervision, care and rehabilitation:

   ·      ·      ·      ·

   (2) order the minor placed on probation under those conditions and limitations that the court may prescribe.

3. *See* AS 47.10.080(b)(1).