William A. RUST, Appellant,

v.

STATE of Alaska, Appellee.

No. 3172.

Supreme Court of Alaska.

July 21, 1978.

Opinion on Rehearing Sept. 15, 1978.
See 584 P.2d 38.

Craig M. Cornish and Robert H. Wagstaff, Anchorage, for appellant.

Dean J. Guaneli, Asst. Atty. Gen., Juneau, Ivan Lawner, Asst. Atty. Gen., Anchorage, Daniel W. Hickey, Chief Prosecutor, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

RABINOWITZ, Justice.

The issues in this appeal, as characterized by appellant, are whether the sentencing court has authority to enforce specific sentencing recommendations and whether the Division of Corrections is required to follow specific sentencing recommendations of the trial court absent a demonstrated contravening compelling need.

The procedural and factual contexts leading to this appeal follow. Appellant William Rust was indicted for the crimes of murder in the first degree and armed robbery. Thereafter, Rust entered pleas of guilty to the lesser included offense of manslaughter and to the crime of armed robbery. Codefendant Steve Bendle was convicted of first degree murder. Bendle had shot a man in Rust's presence, and Rust testified for the prosecution at Bendle's trial. The superior court imposed concurrent 15 year sentences. As part of its formal judgment, the superior court made the following findings:

> [T]he defendant is in need of reading therapy for his dyslexic condition; . . . he is in need of vocational training; and . . . he would benefit greatly from being confined in the greater Anchorage area so that he may be near his family in Eagle River, all of which the court concludes will benefit his rehabilitation and the protection of society greatly.

On the basis of the foregoing, the superior court recommended in its judgment that:

> 1. The [Division] of Corrections provide William Rust with adequate and thorough treatment for his dyslexic reading problem.
>
> 2. The [Division] of Corrections provide William Rust with meaningful vocational training so that he may have a productive skill when he is released.
>
> 3. The [Division] of Corrections place William Rust in a facility in the greater Anchorage area so that his family may be near him during his period of confinement.

Further, the superior court's judgment provided, in part:

> The [superior court] shall keep continuing jurisdiction of this matter in order to determine whether the foregoing recommended special conditions are accomplished. Defendant may properly and for good cause bring to this court's attention the failure to provide the special conditions of sentencing herein enumerated for the purpose of seeking redress thereof.

Within approximately one month of the superior court's entry of judgment, Rust moved for modification of his sentence.

The ground advanced in support of the motion was that on March 31, 1976, he was classified to be sent to the Southeastern Regional Correctional Institution in Juneau. Rust further asserted, "This action has no valid basis and is contrary to [the superior court's] order and the best interests of both society and William Rust."[1] This motion was followed by two additional motions in which Rust sought relief by way of an immediate order prohibiting his transfer to the correctional facility in Juneau, as well as an order directing the Division of Corrections to transfer him to the Anchorage area, or, in the alternative, to modify his sentence to accomplish this end.

After conducting an evidentiary hearing, the superior court entered an order in which it denied Rust's motion to modify his sentence. The superior court also ruled:

> The defendant's motion requesting an order directing the Division of Corrections to transfer the defendant to the Anchorage area is denied on the grounds that this court does not have the legal authority as a sentencing court to issue such an order.[2]

This appeal followed.

In response to Rust's arguments before this court, the state has contended, in part, that because the judicial power to sentence depends upon a specific grant of power from the legislature, the sentencing court may not order particular rehabilitative treatment or institutional placement without legislative authorization. The state notes that the legislature has given the Commissioner of Health and Social Services responsibility for administering correctional programs and prisoner placement; thus, the state argues no legitimate basis exists for the courts to intrude on discretionary treatment and placement decisions made by the executive branch.[3] Since the courts have no power to control these matters, contends the state, the nature of the alleged right of the prisoner which has been infringed is irrelevant.

■ Initially, we note that Alaska's statutory provisions grant power to the courts

---

1. On May 3, 1976, the superior court entered an order which provided that Rust "shall not be transferred from the State of Alaska by the Division of Corrections until further notice." In late June 1976, the state moved to "dismiss" Rust's motion for modification of sentence on the ground that "the previous designation of [Rust] for placement in the Federal Bureau of Prisons has been rescinded and a new classification hearing has been ordered."

2. In ruling orally on the various motions that were before him, the trial judge made the following comments:

   THE COURT: Well, Mr. Wagstaff, it's certainly a compelling argument to any judge, I suppose, and one that sounds good. May be good. As a judge in a case, I'm torn two ways on it. It's pretty easy—in fact, kind of nice, to make recommendations and then forget it and have no responsibility and no conscience to face if nothing happens—just kind of turn away and say, "It's not my job." On the other hand, I'm not sure I'm fulfilling my oath and assuring the fulfillment of a constitutional mandate of rehabilitation if I'm not able to follow up on the recommendations that I make and have some power to require enforcement of those recommendations absent compelling reasons why they shouldn't be carried out.

   . . . . .

   [H]ad Bill Rust been classified to the Federal Bureau of Corrections, I'd have issued an injunction, without any question, to keep him from being transferred there. In my opinion, it would have been cruel and unusual punishment. However, that relief probably should have been sought on the basis of habeas corpus or straight postconviction remedy on the basis of our law as it now stands, and not as part and parcel of the initial sentence.

   The request to have me order those items that I recommended in my sentence is denied, because I have no legal authority to enter such an order on that narrow issue alone.

3. In addition to express constitutional language requiring penal administration to be based, in part, on rehabilitation, Alaska Const. art. I, § 12, statutory provisions require the Commissioner to establish rehabilitation programs, AS 33.30.020, to provide suitable prison facilities for the "care" of offenders, AS 33.30.040, and to "detail physicians, nurses, and psychiatrists, or their aides, and laboratory technicians . . . for the purpose of furnishing necessary medical services . . . ." AS 33.30.050. "The commissioner may authorize a prisoner to participate in educational, training, medical, psychiatric, or other rehabilitation programs . . . ." AS 33.30.260.

to sentence and to review sentences.[4] In previous decisions of this court, we have implied that the sentencing power has its source in the legislature [5] and have expressly recognized the statutory origins of certain powers affecting sentencing.[6] Secondly, Alaska's statutory provisions leave little doubt that the legislature intended to place authority for administering matters affecting prisoners with the Commissioner of Health and Social Services. In this regard, AS 33.30.100 provides, in part, that "The commissioner shall designate the facility where the sentence shall be served." Similarly, AS 33.30.140(a) provides: "A person convicted of an offense against the state and sentenced to a term of imprisonment of more than one year may be confined in a penitentiary or reformatory or other prison facility designated by the commissioner." AS 33.30.120 establishes that "The commissioner may order a prisoner transferred from one facility to another." [7]

In *McGinnis v. Stevens*, 543 P.2d 1221, 1237 (Alaska 1975), we said:

> [D]ecisions of prison authorities relating to classification of prisoners are completely administrative matters regarding which an inmate has no due process rights beyond the expectation of fair and

impartial allocation of the resources of the prison system to its charges. As an extension of the state, the Division of Corrections must administer Alaska's prisons in a manner which is neither arbitrary nor vindictive. However, resource allocation is an executive concern involving many day to day decisions which necessitate that court interference be kept to a minimum. (footnote omitted) [8]

Further, in *Richards v. State*, 451 P.2d 359, 361 (Alaska 1969), we observed that the authority to designate a specific prison facility is "plainly vested" in the Commissioner of Health and Social Services:

> The fact that a particular jail facility was not designated by the sentencing court is in accord with statute. AS 33.30.100 provides that "The commissioner [of the Department of Health and Welfare] shall designate the facility where the sentence shall be served." [9]

Thus, we think it clear that the matter of a prisoner's classification, which encompasses designation of the prison facility to which the prisoner is to be confined, is committed to the administrative discretion of the Division of Corrections, and not to the sentencing courts of Alaska.[10] We thus hold that

---

4. *See* AS 12.55.010–12.55.120. *See generally* sentencing provisions appearing in Alaska's criminal code, AS 11.05.010, 11.05.060, 11.05.-140; Alaska Const. art. IV, § 1.

5. *See, e. g., Faulkner v. State*, 445 P.2d 815, 818 (Alaska 1968).

6. *See, e. g., B. A. M. v. State*, 528 P.2d 437 (Alaska 1974); *Pete v. State*, 379 P.2d 625 (Alaska 1963).

7. AS 33.30.110 stipulates, in part:
   The commissioner may designate a suitable state facility or a suitable facility made available to the state by agreement or contract, to which all persons sentenced to serve a term of one year or less, or detained on temporary commitment, shall be committed.
   *See also* AS 33.30.010 and AS 33.30.020. Under these statutes the control and management of state prison facilities is vested in the Commissioner who also has the duty to classify prisoners in those facilities and to provide for the safety, subsistence, proper government and discipline of prisoners. AS 33.30.040 requires that the Commissioner provide suitable facili-

ties for the safekeeping, housing, care and subsistence of prisoners.
   *See also* AS 33.30.090 which states:
   A person convicted of an offense against the state shall be committed to the custody of the commissioner for the term of imprisonment which the court directs.

8. In a footnote to this portion of our opinion in *McGinnis v. Stevens*, 543 P.2d 1221 (Alaska 1975), we observed:
   We find strong indications of a legislative intent to leave the establishment, control, and management of the prison system in the hands of the Commissioner of the Department of Health and Welfare whenever practical under our constitution. *See* AS 33.30.010 *et seq.*
   *Id.* at 1237 n.48.

9. *See A. A. v. State*, 538 P.2d 1004, 1005 (Alaska 1975); *B. A. M. v. State*, 528 P.2d 437, 438 n.3 (Alaska 1974); *State v. Chaney*, 477 P.2d 441, 447 n.26 (Alaska 1970).

10. Nevertheless we think it appropriate that the Division of Corrections give weight to the

the sentencing court does not have the authority to designate a particular prison facility in which a prisoner is to be confined.[11] Although the sentencing court can recommend that the defendant be incarcerated in a particular facility under Alaska's statutes, the ultimate responsibility for the classification and thus placement of prisoners in its charge has been vested in the Division of Corrections.

Our holding that a sentencing court lacks authority to order the Division of Corrections to incarcerate a prisoner in a designated facility does not completely dispose of this appeal. Although the primary focus of Rust's post-judgment motions were directed at the issue of facility placement, Rust also argued that he was entitled, under Alaska's constitution, to receive treatment for his dyslexic condition.[12] Pertinent

here is a portion of our opinion in *McGinnis v. Stevens*, 543 P.2d 1221, 1236 n.45 (Alaska 1975):

> If fundamental constitutional rights are alleged to be abridged in disciplinary proceedings, it would be the duty of the court to inquire into the allegations.

Thus, the nature of the right asserted by Rust is of potential significance in determining whether intervention by the judiciary in the implementation of the treatment portions of the superior court's sentence is permissible. Constitutional rights to treatment have been established for both mental patients committed through civil proceedings and children committed by juvenile proceedings. In *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), the Court of Appeals for the District of Columbia first recognized a possible right to treat-

---

sentencing court's recommendations as to facility placement. In this regard, the Draft Uniform Sentencing and Corrections Act, National Conference of Commissioners on Uniform State Laws, Section 4–406 (March 1, 1978) provides:

Assignment to Facilities
(a) Factors to be considered in assigning a person to a facility include:
(1) the person's security classification;
(2) the availability of programs in the facilities;
(3) the location of family or other supportive relationships;
(4) the location in which the person intends to reside after release;
(5) the location of employment opportunities;
(6) the wishes of the person to be assigned;
(7) the relationship with other confined persons;
(8) a written pretrial agreement entered into by the person and the prosecuting attorney concerning the facility to which the person would be assigned;
(9) any recommendation made by the sentencing court; and
(10) any other factor established by the director relevant to the selection of an appropriate facility.
*See generally* AS 12.55.075 (1977 Supp.).

11. This conclusion reflects the principles which govern the powers of Alaska's judiciary in relation to those of the executive. In *Public Defender Agency v. Superior Ct., Third Judicial District*, 534 P.2d 947, 950 (Alaska 1975), we articulated these principles in the following manner:

> When an act is committed to executive discretion, the exercise of that discretion

within constitutional bounds is not subject to the control or review of the courts. To interfere with that discretion would be a violation of the doctrine of separation of powers. Although the Alaska Constitution does not expressly address itself to the doctrine of separation of powers, we have noted that often what is implied is as much a part of the constitution as what is expressed. *Wade v. Nolan*, 414 P.2d 689, 698 (Alaska 1966). The state constitution is divided into a number of separate articles. Since Article III concerns the executive branch, it can fairly be implied that this state does recognize the separation of powers doctrine. (footnote omitted)

Other cases relating to the separate roles of the judicial, legislative and executive branches include *Hootch v. Alaska State-Operated School System*, 536 P.2d 793 (Alaska 1975), and *Marrone v. State*, 458 P.2d 736 (Alaska 1969), *cert. denied*, 397 U.S. 967, 90 S.Ct. 1005, 25 L.Ed.2d 260 (1970).

12. In support of his motions before the superior court, Rust also made passing reference to his right to receive vocational training as recommended by the superior court in its sentencing judgment.

In his brief, Rust states:
Generally, dyslexia is a serious reading difficulty which some believe is the product of organic brain lesion. Whatever its etiology its effect is to seriously depreciate one's self-image, and to induce chronic anxiety and depression. 'The Psychiatric Aspects of Dyslexia', Rone, M.D., Senior Consultant in Psychiatry, Mayo Clinic, *Bulletin of the Orton Society* 64, 68 (1971).

ment based upon the due process clause, the equal protection clause or the eighth amendment (cruel and unusual punishment). Although the *Rouse* decision was based upon the statutory right to treatment granted by the D.C.Code to patients involuntarily committed to D.C. mental hospitals, Judge Bazelon noted that confinement in a public mental hospital without treatment might also be unconstitutional. The D.C. Circuit reaffirmed the right to treatment in several cases which followed *Rouse*; [13] other jurisdictions soon recognized a constitutional right to treatment.[14]

The case illustrating most clearly the present status of the constitutional right to treatment of civilly committed mental patients is *Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir. 1974), *vacated* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). A unanimous Fifth Circuit held that the right to treatment for patients involuntarily committed to state mental hospitals through

civil proceedings is guaranteed by the fourteenth amendment.[15] If the state justifies such a "massive curtailment of liberty" under its *parens patriae* authority—rather than its police power [16]—treatment must be provided "lest the involuntary commitment amount to an arbitrary exercise of government power proscribed by the due process clause." [17] However, the distinction between *parens patriae* and police power rationales need not be determinative; treatment must be provided as the *quid pro quo* for confinement in the absence of any one of the three central limitations on the government's power to detain. Those limitations require "that detention be in retribution for a specific offense; that it be limited to a fixed term; and that it be permitted after a proceeding where fundamental procedural safeguards are observed.[18]

The *parens patriae* principle is the core of the established view that juvenile proceed-

---

13. *See In re Curry*, 147 U.S.App.D.C. 28, 452 F.2d 1360 (1971); *Covington v. Harris*, 136 U.S. App.D.C. 35, 419 F.2d 617 (1969); *Dobson v. Cameron*, 127 U.S.App.D.C. 324, 383 F.2d 519 (1967); *Tribby v. Cameron*, 126 U.S.App.D.C. 327, 379 F.2d 104 (1967); *Millard v. Cameron*, 125 U.S.App.D.C. 383, 373 F.2d 468 (1966).

14. *See Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Welsh v. Likins*, 373 F.Supp. 487 (D.Minn.1974); *Stachulak v. Coughlin*, 364 F.Supp. 686 (N.D.Ill.1973).

15. *Donaldson v. O'Connor*, 493 F.2d 507, 520 (5th Cir. 1974).

16. A person who presents a danger to others is committed under the state's police power. A person who requires care and treatment is committed through exercise of the state's *parens patriae* power. One who poses a danger to *himself* is committed under a combination of both powers. *Id.* at 520–21.

17. *Id.* at 521.

18. *Id.* at 522. The *quid pro quo* was defined as "such individual treatment as will give him a reasonable opportunity to be cured or to improve his mental condition." *Id.* at 520.

The Supreme Court vacated *Donaldson* on appeal—specifically declining to rule on the "right to treatment" aspect of the case and narrowing its ruling to the facts of the case. *O'Connor v. Donaldson*, 422 U.S. 563, 573, 576, 95 S.Ct. 2486, 2492, 2494, 45 L.Ed.2d 396, 405–07 (Alaska 1975). The Court concluded that

since Donaldson was not dangerous, his long custodial confinement without treatment denied his due process right to liberty. The Court avoided the following questions raised by the Fifth Circuit:

1. Whether involuntarily committed mentally ill people who are dangerous have a right to treatment.

2. Whether mentally ill people who are not dangerous may be committed if the state offers them treatment, and

3. Whether civilly committed mental patients who are not dangerous have a right to treatment.

The only point determined by the Court was its conclusion that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Id.*, 422 U.S. at 576, 95 S.Ct. at 2494, 45 L.Ed.2d at 407.

Thus, despite wide acceptance of the "right to treatment" concept by commentators, *see, e. g.*, Bazelon, *Implementing the Right to Treatment*, 36 U.Chi.L.Rev. 742 (1969); Chambers, *Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives*, 70 Mich.L.Rev. 1108 (1972); *Symposium—The Right to Treatment*, 57 Geo.L.J. 673 (1969), and a strong foundation in the lower courts, the United States Supreme Court's view of a constitutional basis for a right to treatment remains uncertain.

ings are different from criminal trials. Accordingly, a *parens patriae rationale* has been used to justify restrictions on due process safeguards—although protections have been increasingly extended in recent years.[19] Where juveniles are confined without the due process rights afforded adults, they have a right to treatment. A *quid pro quo* rationale similar to that in the Fifth Circuit's *Donaldson* opinion has developed: the possibility of long-term confinement without complete procedural due process can be justified only if the government's goal is rehabilitation, and confinement in the absence of treatment is not sufficiently related to that goal. The due process right to treatment of juveniles appears well-established among both courts[20] and commentators.[21]

In the cases finding rights to treatment for juveniles and mental patients, reliance upon a *parens patriae* rationale for commit-

ment is crucial. Both sets of cases view treatment as the *quid pro quo* which must be present in order to justify confinement under limited due process safeguards. Even those decisions articulating a right to treatment imply that the transition from *parens patriae* to police power will reduce the government's constitutional responsibility to provide treatment since the *quid pro quo* theory is then no longer compelling. In the case at bar, Rust was sentenced under the police power, for a limited period and with full due process safeguards. Thus, the right to treatment of confined juveniles and mental patients does not furnish a complete analogy.

Concerning adult criminal inmates, the common law has recognized that "[i]t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself."[22] Federal courts have ordered penal

---

**19.** *See Breed v. Jones*, 421 U.S. 519, 97 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (protection against double jeopardy); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (rights to counsel, to be informed of charges, against self-incrimination); *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) (basic due process and fairness); *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (protection against use of confession obtained before juvenile had received appropriate, friendly consultation from adult). *But see McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (no right to jury trial). However, interpreting Alaska Const. art. I, §§ 1 and 11, we held in *R. L. R. v. State*, 487 P.2d 27, 33 (Alaska 1971),

> that whenever a child in a delinquency proceeding is charged with acts which would be a crime, subject to incarceration if committed by an adult, the Alaska Constitution guarantees him the right to a jury trial. (footnote omitted)

**20.** *See, e. g., Nelson v. Heyne*, 491 F.2d 352 (7th Cir.), *cert. denied* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Morales v. Turman*, 383 F.Supp. 53 (E.D.Tex.1974); *Martarella v. Kelley*, 359 F.Supp. 478 (S.D.N.Y.1973), *enforcing* 349 F.Supp. 575 (S.D.N.Y.1972); *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972).

**21.** *See, e. g.,* Wald & Schwartz, *Trying a Juvenile Right to Treatment Suit: Pointers and Pitfalls for Plaintiffs*, 12 Am.Crim.L.Rev. 125 (1974); Kittrie, *Can the Right to Treatment*

*Remedy the Ills of the Juvenile Process?*, 57 Geo.L.J. 848 (1969).

As noted above, rehabilitation rather than punishment is the express purpose of juvenile jurisdiction. Mere confinement without treatment does not contribute to the goal of rehabilitation; such confinement constitutes cruel and unusual punishment. The Supreme Court of the United States has held that cruel and unusual punishment results when a person is imprisoned without being found guilty of a criminal act. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). "Delinquent" status depends not upon a criminal conviction but upon proof that the juvenile committed acts which would be criminal if committed by an adult. *See* AS 47.10.010(a), 47.10.290(2); *L. A. M. v. State*, 547 P.2d 827, 836 and concurrence of Rabinowitz, J. at 837 (Alaska 1976). Thus, *Robinson* should preclude commitment of juvenile delinquents for punishment rather than treatment. *See Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972); Lovell, *The Right to Treatment for Mentally Ill Juveniles in California*, 27 Hastings L.J. 865 (1976). In *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974), the court found eighth amendment violations because the use of disciplinary beatings and tranquilizing drugs to control behavior was disproportionate to those behaviors and the measures chosen violated "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Id.* at 356.

**22.** *Spicer v. Williamson*, 191 N.C. 487, 132 S.E. 291, 293 (1926). *See also Brabson v. Wilkins*,

institutions to provide adequate food, clothing and shelter for their prisoners.[23] In *Newman v. State of Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), the Fifth Circuit found eighth amendment violations in the Alabama Penal System's inadequate medical care facilities and lack of staff. The court concluded that constitutional violations of either the eighth amendment's prohibition against cruel and unusual punishment[24] or the 14th amendment's due process clause had been shown.[25]

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court of the United States clarified the reach of the eighth amendment where prison officials fail to provide medical care needed by prisoners:

> Our more recent cases . . . have held that the Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency . . ,' against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or which 'involve the unnecessary and wanton infliction of pain.'

. . . . .

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' *Gregg v. Georgia*, [428 U.S. 153, 182–83], 96 S.Ct. 2909, 49 L.Ed.2d 859, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally

45 Misc.2d 286, 256 N.Y.S.2d 693 (Sup.Ct. 1965); Neisser, *Is There a Doctor in the Joint? The Search for Constitutional Standards for Prison Health Care*, 63 Va.L.Rev. 921 (1977).

**23.** *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973), *aff'd*, 494 F.2d 1196 (1st Cir.), *cert. denied*, 419 U.S. 1977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), *aff'd*, 501 F.2d 1291 (5th Cir. 1974); *Collins v. Schoonfield*, 344 F.Supp. 257 (D.Md.1972); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971).

**24.** Cases recognizing that denial of medical care may violate the eighth amendment include *Gates v. Collier*, 501 F.2d 1291, 1302 (5th Cir. 1974); *Finney v. Arkansas Bd. of Corr.*, 505 F.2d 194, 202–04 (8th Cir. 1974); *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970); *Martinez v. Mancusi*, 443 F.2d 921, 923 (2d Cir. 1970), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971). *See generally Ames v. Kuehnle*, 425 F.2d 224 (5th Cir. 1970).

Article I, section 12 of the Alaska Constitution guarantees freedom from the infliction of cruel and unusual punishment.

**25.** Cases recognizing that denial of medical care may violate due process include *Westlake v. Lucas*, 537 F.2d 857, 859–60 (6th Cir. 1976); *Runnels v. Rosendale*, 499 F.2d 733 (9th Cir. 1974); *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir.), *vacated on other grounds* 119 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974), *on remand* 516 F.2d 889, *cert. denied*, 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed.2d 110 (1975); *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972); *Stiltner v. Rhay*, 371 F.2d 420, 421 n.3 (9th Cir.), *cert. denied*, 389 U.S. 1025, 88 S.Ct. 589, 19 L.Ed.2d 675 (1967).

Of particular interest are the *Newman* court's comments concerning the deference normally accorded discretionary decisions of prison officials:

> [T]he existence of constitutional infirmities deprives the prison deference rule of its indomitably insulating nature and dictates that the rule yield to the remedial power of a court.

*Newman v. State of Alabama*, 503 F.2d 1320, 1332 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975). The *Newman* court also noted the rehabilitative role of proper medical care:

> Deep-seated inmate frustration can be exacerbated by a perceived callous indifference to their medical plight. The incidence of frustration thwarts the purported goal of rehabilitation . . . and thereby jeopardizes the ability of inmates to assimilate into the population at large when ultimately released. While it is not our function to expect or demand alchemy of prison officials, it is our role to ensure that the plight of inmates is not constitutionally forsaken.

503 F.2d at 1333.

Article I, section 7 of the Alaska Constitution guarantees that no person shall be deprived of life, liberty, or property, without due process of law.

denying or delaying access to medical care or interfering with the treatment once prescribed.[26]

We think it of importance that the treatment needs which triggered the eighth amendment were characterized by the Supreme Court as "serious medical needs." As previously noted in *Newman v. State of Alabama, supra,* the Fifth Circuit found both eighth and 14th amendment violations, in part, because the Alabama Penal System was not providing eyeglasses and prosthetic devices.[27] However, in *Newman* a variety of other medical needs were not being treated properly due to grossly inadequate staff and facilities; the individual needs which deliberately were not met in the Alabama system would probably have qualified as "serious" under the *Estelle v. Gamble* standard.

Of significance to our resolution of Rust's claim that he has a right to receive treatment for his dyslexic condition is the Fourth Circuit's opinion in *Bowring v. Godwin,* 551 F.2d 44 (4th Cir. 1977). There Bowring, who was incarcerated under state law, attacked the denial of his application for parole and sought psychiatric and psychological treatment to render him eligible for parole. The district court dismissed Bowring's action on the ground that he had not alleged denial of any constitutional rights. The Fourth Circuit reversed on the basis of several of the authorities to which we have previously alluded in this opinion and, in part, placed significant reliance upon *Newman v. Alabama, supra.* More particularly, the Fourth Circuit held:

> Bowring (or any other prison inmate) is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or denial of care would be substantial.[28]

Further, the *Bowring* court qualified its articulation of the inmate's right to psychological or psychiatric treatment in the following manner:

> [T]he essential test is one of medical necessity and not simply that which may be considered merely desirable.[29]

Concerning the basis for this right to psychological or psychiatric treatment, the court reasoned:

> This limited right to treatment stems from the Eighth Amendment, whose language must be interpreted in light of 'the evolving standards of decency that mark the progress of a maturing society.' It is also premised upon notions of rehabilitation and the desire to render inmates useful and productive citizens upon their release.[30]

---

**26.** *Estelle v. Gamble,* 429 U.S. 97, 102–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251, 259–60 (1976) (citations and footnotes omitted).

**27.** *Newman v. State of Alabama,* 503 F.2d 1320, 1331 (5th Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975). The court explained, "Since equally severe harm can be occasioned by the unavailability of eyeglasses . . . we should not be any less prone to disparage these deficiencies." *Id.*

**28.** *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir. 1977).

**29.** *Id.* at 47–48.

**30.** *Id.* at 48 (citation and footnote omitted). In reaching its holding the *Bowring* court specifically disavowed

any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment. The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion. *Russell v. Sheffer,* 528 F.2d 318, 319 (4 Cir. 1974); *Thomas v. Pate,* 493 F.2d 151, 158 (7 Cir.), *cert. denied sub nom., Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974); *Jones v. Lockhart,* 484 F.2d 1192, 1194 (8 Cir. 1973); *Corby v. Conboy,* 457 F.2d 251, 254 (2 Cir. 1972). . . . (footnote omitted) *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977).

In addition to the foregoing, we do not think the treatment issues raised by Rust can be disposed of without resort to the applicable statutory law. In this regard, we believe that AS 33.30.050 and AS 33.30.020 are of paramount importance. The first-mentioned statute provides, in part:

> The commissioner shall detail physicians, nurses, and psychiatrists, or their aides, and laboratory technicians, employed by the department to any prison facility where state prisoners are detained or confined, for the purpose of furnishing necessary medical services . . . .[31]

AS 33.30.020 requires that the commissioner "establish programs for the treatment, care, rehabilitation and reformation of prisoners."[32] From the foregoing, we think it clear that Alaska's legislature has determined that a prisoner has the right to receive necessary medical services, including psychiatric care, while confined. We are further persuaded that the *Bowring* test is appropriate[33] and therefore adopt its criteria in determining questions as to the right of a prisoner to receive psychological or psychiatric care under the provisions of AS 33.30.020 and AS 33.30.050. In short, we hold that pursuant to the provisions of AS 33.30.020 and AS 33.30.050 a prisoner in the custody of the Division of Corrections has the right to receive psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty that the prisoner's symptoms evidence a serious disease or injury, that such disease or injury is curable or may be substantially alleviated and that the potential for harm to the prisoner by reason of delay or denial of care could be substantial.[34]

We adopt the *Bowring* criteria with full recognition that inherent in the test criteria are "grey areas" due to the impossibility of fitting health problems into discrete classifications such as "serious" and "harmless," "physical" and "mental," or even "medical" and "non-medical." Nevertheless, we are confident that these criteria can be rationally applied and that they represent apposite standards for delineating both the inmate's right to psychological or psychiatric treatment and the appropriate circumstances for judicial intervention in daily operations of penal institutions.

In light of the fact that this aspect of the appeal was not explored in any significant detail before the superior court, we remand the matter to the superior court to conduct such further hearings as it considers necessary for the purpose of determining, in accordance with this opinion,

---

31. AS 33.30.050 further provides:
    However, if medical services cannot be furnished by physicians, nurses, psychiatrists, or their aides, and laboratory technicians, regularly employed by the department, the commissioner may contract with private practitioners located in the area of a prison facility to furnish these services. The cost of contracted services shall be paid out of appropriations made to the department. (§ 3 ch. 133 SLA 1960)
    *See also* Iselo, *Constitutional Issues of the Prisoner Right to Health Care*, American Medical Association (1977); American Bar Association, Joint Committee on the Legal Status of Prisoners, Standards Relating to the Legal Status of Prisoners, § 5.1; National Advisory Commissioner Criminal Justice Standards and Goals, Standards on Correction, Std. 2.6 (1973).

32. AS 33.30.020 reads in full:
    The commissioner shall establish prison facilities and classify the prisoners in prison facilities. He shall provide for the safety, subsistence, proper government, and discipline of prisoners. He shall establish programs for the treatment, care, rehabilitation and reformation of prisoners.
    *See also* AS 33.30.060(a) and AS 33.30.260 (Supp.1977).

33. Since the Fourth Circuit's decision in *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977), at least one federal court has followed the *Bowring* test. *See Laaman v. Helgemoe*, 437 F.Supp. 269, 313 (D.N.H.1977) (civil rights action under 42 U.S.C. § 1983 concerning conditions and programs at the New Hampshire state prison). *See also*, Hoard, *Prisoners' Rights—Bowring v. Godwin: The Limited Right of State Prisoners to Psychological and Psychiatric Treatment*, 56 N.C.L.Rev. 612.

34. Generally these criteria are to be interpreted and applied in a manner so that prisoners will have the right to receive medical care under circumstances in which a reasonable person would seek medical care.

Rust's treatment claims pertaining to his dyslexic condition.

Affirmed and remanded for further proceedings consistent with the foregoing.[35]

**35.** We have determined that the case at bar does not present an appropriate vehicle for delineation of the contours of a prisoner's right to rehabilitation under either Article I, section 12 of the Alaska Constitution or AS 33.30.020.